1
2
3  **IN THE UNITED STATES BANKRUPTCY COURT**
4  **FOR THE DISTRICT OF ARIZONA**
5

| In re: | Chapter 11 |
| | Case No. 2:09-bk-19166-RJH |
| RED MOUNTAIN MACHINERY COMPANY, | Case No. 2:09-bk-19170-RJH |
| RED MOUNTAIN HOLDINGS, LLC, | Case No. 2:09-bk-19175-RTB |
| RED MOUNTAIN PACIFIC LLC, | Case No. 2:09-bk-19178-RJH |
| BTH,LLC, | (Jointly Administered Under Case No. 2:09-bk-19166-RJH) |
| Debtors. | |
| | **(Applies to All Debtors)** |

## DISCLOSURE STATEMENT
### for
## DEBTORS' JOINT PLAN OF REORGANIZATION

**Filed by:**
**Red Mountain Machinery Company**
**Red Mountain Holdings, LLC**
**Red Mountain Pacific LLC**
**BTH, LLC**
**debtors in possession**

**Dated December 9, 2009**

**Prepared by:**
Steven N. Berger, Esq.
Scott B. Cohen, Esq.
Patrick A. Clisham, Esq.
**ENGELMAN BERGER, P.C.**
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
(602) 271-9090

Attorneys for Red Mountain Machinery Company, Red Mountain Holdings, LLC
Red Mountain Pacific LLC and BTH, LLC
debtors in possession

**TABLE OF CONTENTS**

I.     INTRODUCTION TO THIS DISCLOSURE STATEMENT ........................................... 1

II.    DISCLAIMERS AND NATURE OF INFORMATION CONTAINED IN DISCLOSURE STATEMENT ....................................... 1

III.   ANSWERS TO COMMONLY ASKED QUESTIONS ........................................... 2

IV.    PLAN APPROVAL PROCESS ................................................. 7

V.     DEFINITIONS ........................................... 7

VI.    BACKGROUND AND DESCRIPTION OF THE DEBTORS ....................... 16

VII.   DEBTORS' ASSETS ................................................. 23

VIII. DEBTORS' DEBT STRUCTURE ....................................... 25

IX.    POTENTIAL AVOIDANCE ACTIONS ................................... 27

X.     OTHER LITIGATION ........................................... 28

XI.    DEBTORS' ACTIONS AND SIGNIFICANT POST-FILING EVENTS ............... 28

XII.   SUMMARY OF THE PLAN ........................................... 32

XIII. TREATMENT OF ALLOWED CLAIMS BY CLASS ........................... 36

XIV. EXECUTORY CONTRACTS AND LEASES ................................. 47

XV.    LITIGATION ........................................... 48

XVI. IMPLEMENTION OF THE PLAN ....................................... 49

XVII. CHAPTER 7 LIQUIDATION COMPARISON ............................... 56

XVIII.    TAX CONSEQUENCES OF THE PLAN ........................... 59

XIX. CONCLUSION ........................................... 59

# I.     INTRODUCTION TO THIS DISCLOSURE STATEMENT

Red Mountain Machinery Company, Red Mountain Holdings, LLC, Red Mountain Pacific LLC and BTH, LLC (hereinafter collectively the "Debtors") submit this Disclosure Statement in connection with the "Debtors' Joint Plan of Reorganization" dated December 9, 2009 ("Plan").  A copy of the Plan is attached to this Disclosure Statement as **Exhibit 1.**  This Disclosure Statement is intended to provide creditors and interested parties with sufficient information from which to make an informed decision when voting to accept or reject the Plan. The Debtors have submitted this Disclosure Statement for approval by the Bankruptcy Court pursuant to Bankruptcy Code § 1125. Bankruptcy Code § 1125(b) prohibits solicitation of an acceptance or rejection of a plan unless a copy of the plan or summary of the plan is accompanied by a disclosure statement approved by the Bankruptcy Court.

All words or phrases used in this Disclosure Statement shall have their usual and customary meanings.  Capitalized words or phrases have the definitions set forth in this Disclosure Statement and Plan.

NO REPRESENTATIONS CONCERNING THE BANKRUPTCY ESTATE, THE DEBTORS OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT AS APPROVED BY THE BANKRUPTCY COURT.

# II.    DISCLAIMERS AND NATURE OF INFORMATION CONTAINED IN DISCLOSURE STATEMENT

The Debtors neither warrant nor represent that there are no inaccuracies in this Disclosure Statement, although the information provided is accurate to the best of the knowledge, information and belief of the Debtors.  Creditors and interested parties should be aware that the Debtors' books and records, from which the information contained herein is derived, have not been audited, and therefore could contain inaccurate information.  The Debtors' management has taken reasonable steps

to ensure that the information provided is materially accurate to the best of its knowledge and belief.

MOREOVER, THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE COURT'S APPROVAL HEREOF ONLY SIGNIFIES THAT IF THE INFORMATION CONTAINED HEREIN IS ACCURATE, IT IS SUFFICIENT TO PROVIDE CREDITORS AND INTERESTED PARTIES AN ADEQUATE BASIS TO DECIDE WHETHER TO ACCEPT OR REJECT THE PLAN. COURT APPROVAL IS NOT A JUDICIAL ENDORSEMENT OF THE PLAN.

## III.    ANSWERS TO FREQUENTLY ASKED QUESTIONS ABOUT REORGANIZATION.

As part of the Debtors' effort to inform creditors regarding the Debtors' Plan and the plan confirmation process, the following summary provides answers to various questions, which are often asked by a party receiving a disclosure statement.

THE FOLLOWING SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY.

### A.    WHO ARE THE DEBTORS?

Red Mountain Machinery Company, an Arizona corporation, Red Mountain Holdings, LLC, an Arizona limited liability company, Red Mountain Pacific LLC, a California limited liability company, and BTH, LLC, an Arizona limited liability company. Sections VI, VII and VIII of this Disclosure Statement contain summaries of the Debtors, their history, assets and liabilities, and the events in this jointly-administered Chapter 11 Case.

### B.    HOW LONG HAVE THE DEBTORS BEEN IN CHAPTER 11?

Since August 11, 2009.

### C.    WHAT IS CHAPTER 11?

Chapter 11 is the business reorganization provision of the Bankruptcy Code. As applicable here, it allows a debtor to submit a plan providing new terms for the payment of its debts so that it may continue to stay in business.

### D.    WHAT ARE THE DEBTORS ATTEMPTING TO DO IN CHAPTER 11?

The principal objective of a Chapter 11 case is confirmation of a plan of reorganization

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

that enables a financially distressed debtor to stay in business. A plan of reorganization sets forth the means for treating impaired and unimpaired claims against a debtor. A claim is impaired under a plan of reorganization if the plan provides that such claim will not be repaid in full or that the legal, equitable, or contractual rights of the holder of such claim will be altered. A claim is unimpaired if it will be paid in full and the legal, equitable or contractual rights of the holder of such claim are not altered by the plan of reorganization. A holder of an impaired claim generally is entitled to vote on a plan of reorganization if such claim has been allowed under Section 502 of the Bankruptcy Code.

E. **HAVE THE DEBTORS PROPOSED A PLAN OF REORGANIZATION?**

Yes. On December 9, 2009, the Debtors filed their Joint Plan with the Bankruptcy Court. This Disclosure Statement contains a summary of the Plan in Section XII. The Plan contemplates the emergence of the Debtors as a single operating entity engaged in the equipment rental business, but owning a streamlined equipment portfolio after recapitalization through an equity infusion. The Plan contemplates initial payments and periodic payments from the recapitalization and from operating profits over a 7-year period.

The Plan is further described in this Disclosure Statement.

F. **IF THE PLAN OF REORGANIZATION GOVERNS HOW MY CLAIM IS TREATED, WHY AM I RECEIVING THIS DISCLOSURE STATEMENT?**

The Bankruptcy Code requires that the Debtors solicit acceptances and rejections of the proposed Plan before the Plan can be confirmed by the Bankruptcy Court. Before the Debtors can solicit acceptances of the Plan, the Bankruptcy Court must approve the Disclosure Statement and determine that the Disclosure Statement contains information adequate to allow creditors to make informed judgments about the Plan. After Bankruptcy Court approval of the Disclosure Statement, the Disclosure Statement, proposed Plan and a ballot are sent to the holders of claims. Creditors then have opportunity to vote to accept of reject the Plan and should consider this Disclosure Statement prior to submitting their ballot.

G. **HAS THIS DISCLOSURE STATEMENT BEEN APPROVED BY THE COURT?**

Yes. The Bankruptcy Court approved this Disclosure Statement as containing

information of a kind, and in sufficient detail, as is reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records, to enable a hypothetical, reasonable investor typical of holders of claims of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement does not constitute an endorsement of any of the information contained in either the Disclosure Statement or the Plan. Likewise, although the Debtors and their counsel have utilized information believed to be accurate in preparing this Disclosure Statement, neither the Debtors nor any of its counsel warrant the accuracy of the information contained in or relied upon in preparing this Disclosure Statement, nor should this Disclosure Statement be construed to be any representation or warranty whatsoever express, implied or otherwise, that the Plan of Reorganization is free from risk, that acceptance or confirmation of the Plan will result in a risk-free or assured restructuring of the debts of the Debtors, or that the projections or plans of the Debtors for payment will be realized.

**H.      WHY IS CONFIRMATION OF THE PLAN OF REORGANIZATION IMPORTANT?**

Confirmation of the Plan by the Bankruptcy Court is necessary for the Debtors to provide the proposed treatment to Creditors under the Plan and stay in business. Unless the Plan is confirmed, the Debtors are legally prohibited from providing you what has been proposed in the Plan and the Debtors will likely be liquidated.

**I.      WHAT IS NECESSARY TO CONFIRM THE PLAN OF REORGANIZATION?**

At a hearing scheduled by the Bankruptcy Court, the Court will consider whether the Plan should be confirmed. Section 1129 of the Bankruptcy Code contains the requirements for confirmation of a Plan of Reorganization. **YOUR VOTE IS IMPORTANT.** A form of ballot will accompany this Disclosure Statement. In order for the Plan to be accepted, at least two-thirds in dollar amount and more than one-half in number of the ***voting creditors*** in each class must affirmatively vote for the Plan. The Court must find that the Plan complies with the applicable provisions of the Bankruptcy Code and that the proponent of the Plan has also complied with the Bankruptcy Code. The Court must also find that the Plan has been proposed in good faith and not by any means forbidden by law. The Court must find that the proponent of the Plan, that is the Debtors,

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

have disclosed the identity and affiliation of the persons who will manage the Debtors after confirmation, that the appointment of such persons is consistent with the interest of creditors and equity holders and with public policy, and that the identity and compensation of any insiders that will be employed or retained by the Reorganized Debtor has been disclosed. The Court must additionally find that each class of claims has either accepted the Plan or will receive at least as much as it would under a Chapter 7 liquidation. The Bankruptcy Code also provides for the treatment of certain priority claims. If any classes of claims are impaired under the Plan, the Court must find that at least one Class of Claims that is impaired has accepted the Plan without counting any votes by Insiders. The Court must also find that confirmation of the Plan of Reorganization is not likely to be followed by the liquidation or the need for further reorganization of the Debtors. Additionally, the Plan of Reorganization must provide for payment of fees to the United States Trustee.

In the event the Plan is not accepted by all Classes of Claims or Interests, the Debtors may attempt to obtain confirmation under what is known as "cram-down." To obtain confirmation by cram-down, the Court must find that the Plan of Reorganization does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired by the Plan and has not accepted the Plan. The Bankruptcy Code provides several options for a Plan of Reorganization to be "fair and equitable" to a secured creditor. Included among these options are that a secured creditor retains its lien and receives deferred cash payments at a market interest rate totaling either the value of the property securing the claim or the amount of the Allowed Secured Claim as found by the Court, whichever is less. With respect to a class of unsecured claims, the requirement that a Plan of Reorganization be "fair and equitable" requires that the holder of an unsecured claim be paid the allowed amount of its claim or that no junior interest receive or retain any property on account of its prior claim. With respect to an interest, the requirement that a Plan of Reorganization be "fair and equitable" requires that the holder of an interest receive or retain property under the Plan of Reorganization having a value equal to the value of the holder's interest or that the holder of any interest that is junior not receive or retain property under the Plan of Reorganization on account of such junior interest.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

**J.** **ARE CREDITORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION?**

Each creditor holding an Allowed Claim that is impaired by the plan is entitled to vote on the Debtors' Plan. If you are an impaired creditor, a ballot to be used for voting on the Plan will be distributed to you. If you lose your ballot, you may request another one from Debtors' Counsel. Instructions for completing and returning the ballot are set forth on the ballot and should be reviewed carefully.

**K.** **HOW WILL THIS PLAN OF REORGANIZATION TREAT MY CLAIM?**

Persons that are owed money by the Debtors hold what are known as "claims". The Plan organizes claims into classes based upon the type of claim and the treatment which it will receive under the Plan. In order to determine how the Plan treats your claim, you must first determine which class covers your claim.

The following chart tells you where in the Plan to look to find the treatment of your claim. Please note that the pages indicated in the following chart refer to the page number of the Plan, rather than the page number of this Disclosure Statement:

| CLASS | TYPE OF CLAIMS | PAGES IN PLAN DISCUSSING CLASS |
|-------|----------------|-------------------------------|
| **1** | Administrative Expense Claims | 13 |
| **2** | Comerica Allowed Secured Claim | 14 |
| **3** | Secured Property Tax Claims | 20 |
| **4** | Priority Employee Claims | 20 |
| **5** | Priority Tax Claims | 21 |
| **6** | Consignment Claims | 21 |
| **7** | Comerica Deficiency Claim | 23 |
| **8** | General Unsecured Claims | 23 |
| **9** | Existing Equity Interests | 23 |
| **10** | Equitable Subordination Claims | 24 |

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## IV. PLAN APPROVAL PROCESS

The Disclosure Statement and Plan classify all creditors into Classes and set forth the treatment of each Class. You should examine the treatment of the Class under which your particular claim(s) may fall. The Debtors believe that treatment of each Class of Claims complies with the requirements under Bankruptcy Code § 1129. After the Bankruptcy Court approves the Disclosure Statement, holders of Allowed Claims may vote to accept or reject the Plan. After notice and hearing, the Bankruptcy Court may approve or confirm the Plan upon the affirmative vote of the necessary Classes of claims and interests. A Class of creditors will be deemed to have accepted the Plan if a majority of such creditors holding at least two-thirds in dollar amount and more than one-half in number of Allowed Claims of that Class voting accept the Plan. A Class of interest holders will be deemed to have accepted the Plan if the holders of two-thirds of the amount of allowed interests voting accept the Plan. **Thus, if you do not vote on the Plan, the wishes of other creditors or interested parties may govern the treatment of your Claims or interests. The Debtors therefore highly recommend that you participate in the voting process by timely providing the Debtors with your ballot accepting or rejecting the Plan. Ballots will be distributed following Court approval of this Disclosure Statement.**

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY**. It is designed to assist you in ultimately voting on the Plan. Before you can vote on the Plan, however, the Court must approve this Disclosure Statement as being in compliance with the mandates of the Bankruptcy Code. Once the Court approves this Disclosure Statement, the Debtors may commence solicitation of votes from creditors and interested parties. Accordingly, you should rely upon this Disclosure Statement for your decision to accept or reject the accompanying Plan only after it has been approved by the Court.

## V. DEFINITIONS.

Except as expressly provided otherwise herein, or unless the context otherwise requires, the following terms will have the meanings stated. The singular/plural uses or the conjunctive and disjunctive uses thereof will be interchangeable, and the terms will include masculine, feminine and

neutral genders. Additional quoted terms are defined as set forth in the text of the Plan and/or Disclosure Statement. The defined terms used in the Plan and Disclosure Statement are as follows:

1. **Administrative Expense Claim** shall mean: (1) every cost or expense of administration of the Reorganization Cases, including any actual and necessary post-petition expenses of preserving the Estates; (2) any actual and necessary post-petition expenses of the Debtors; (3) any professional fees allowed by the Bankruptcy Court pursuant to interim and final approvals in accordance with Bankruptcy Code §§ 330, 331, and 503(b); and (4) all fees and charges assessed against the Estates under Chapter 123 of Title 28, United States Code.

2. **Administrative Expense Claims Bar Date** shall mean the first Business Day after the 60th day after the Effective Date.

3. **Allowed Claim** shall mean every Claim against the Bankruptcy Estates as to which a proof of such Claim has been filed within the Bar Date (or appropriate application as to Administrative Expense Claims) and: (1) as to which no objection to the allowance of such Claim has been filed within any applicable time period fixed by the Plan or the Bankruptcy Court; or (2) as to which the order allowing such Claim has become final and non-appealable without any appeal, review, or other challenge of any kind to that order having been taken or being still timely. If any Claim or the Creditor asserting such Claim is subject to any defense, setoff, counterclaim, recoupment, or other adverse Claim of any kind of the Debtors, including, but not limited to, any pending appeal or unexpired right to appeal, that Claim will be deemed a Disputed Claim and it will not become an Allowed Claim unless and until all disputes are resolved or adjudicated fully and finally, with all appellate rights having been exhausted.

4. **Arizona Guarantor Litigation** shall mean the claims of Owen Cowing and Linda Cowing pending against Comerica, Dierich and the Employee Defendants in the Comerica/Dierich Litigation.

5. **Ballot** shall mean a form of ballot served by Debtors on the holders of all Claims entitled to vote on the acceptance or rejection of this Plan, which shall provide a checkbox for such

Claimants to indicate their vote and, if applicable, checkboxes for the making of any additional elections that such Claimants are entitled to make under the terms of the Plan.

6.      **Bankruptcy Code** shall mean Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*., and related provisions under Title 28 and Title 15, U.S. Code, as they may be amended from time to time.

7.      **Bankruptcy Court or Court** shall mean the United States Bankruptcy Court for the District of Arizona or such other court that exercises jurisdiction over all or part of the Reorganization Cases including the United States District Court for the District of Arizona to the extent that the reference of the Reorganization Cases are withdrawn.

8.      **Bankruptcy Estates or Estates** shall mean the estates created pursuant to 11 U.S.C. § 541 upon the Debtors' filing of the Reorganization Cases.

9.      **Bar Date** shall mean December 7, 2009, the date set by the Bankruptcy Court by which creditors are required to file proofs of claim.

10.      **Business Day** shall mean every day except Saturdays, Sundays, and federal and state holidays observed by the Bankruptcy Court.

11.      **Causes of Action** shall mean all of the Bankruptcy Estates' existing and potential claims and causes of action, including but not limited to any claims that may be brought by the Debtors under the Bankruptcy Code and applicable state law, and causes of action that were pending or could have been brought by the Debtors at the Filing Date.

12.      **Claim** shall mean "Claim" as defined in Bankruptcy Code § l01(5).

13.      **Claimant** shall mean the holder of a Claim.

14.      **Claims Objection Date** shall mean the date by which the Debtors or any interested party must file objections to Claims, which shall be the first Business Day after 90 days after the Effective Date.

15.      **Class** shall mean each of the classifications of Claims and Interests described in the Plan.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

16. **Collateral** shall mean all of the Debtors' assets to which the Comerica's security interests have attached pursuant to the terms of the Comerica Security Agreement.

17. **Collection Litigation** shall mean all pending matters against third parties for collection of monies and/or receivables, including without limitation, the matters listed on **Exhibit A** hereto.

18. **Comerica Credit Agreement** shall mean the "Credit Agreement" dated June 2, 2003 by and among Red Mountain Machinery Company, Red Mountain Pacific LLC, Red Mountain Holdings, L.L.C. and BTH, LLC as collective "Borrower" and Comerica Bank-Texas as "Bank."

19. **Comerica Deficiency Claim** shall mean any Allowed Unsecured Claim of Comerica to be determined by Final Order of the Court after resolution of the Comerica/Dierich Litigation.

20. **Comerica/Dierich Litigation** shall mean Adversary Proceeding No. 2:09-ap-00941-RJH commenced August 14, 2009, in the lead bankruptcy case of Red Mountain Machinery Company, Case No. 2:09-bk-19166-RJH.

21. **Comerica Loan Documents** shall mean the Comerica Note, Comerica Credit Agreement and Comerica Security Agreement, as modified or extended from time to time.

22. **Comerica Note** shall mean the "Master Revolving Note" executed by the Debtors on June 2, 2003, in the original principal amount of $10,000,000, as amended from time to time.

23. **Comerica Security Agreement** shall mean the "Security Agreement (Inventory)" dated June 2003 by and among Red Mountain Machinery Company, Red Mountain Pacific LLC, Red Mountain Holdings, L.L.C. and BTH, LLC as collective "Debtor" and Comerica Bank-Texas as "Bank."

24. **Comerica Non-settlement Plan Treatment** shall mean the Debtors' proposed treatment of Comerica's Claims pursuant to Section VII of the Plan.

25. **Comerica Settlement Plan Treatment** shall mean the Debtors' proposed treatment of Comerica's Claims pursuant to Section VII of the Plan.

26. **Confirmation Date** shall mean the date the Bankruptcy Court enters the Confirmation Order on the Court docket.

27.     **Confirmation Hearing** shall mean a hearing conducted by the Bankruptcy Court pursuant to Bankruptcy Code § 1128(a) for the purpose of determining whether to enter a Confirmation Order.

28.     **Confirmation Order** shall mean an order entered by the Bankruptcy Court approving the Plan.

29.     **Consignment Agreements** shall mean – (1) Owner's Management Agreement between RMMC and BTS, Inc.; (2) Owner's Management Agreement between RMMC and Schogan Companies; (3) Owner's Management Agreement between RMMC and Mikota, LLC; (4) Owner's Management Agreement between RMMC and Centerline Equipment, LLC; (5) Owner's Management Agreement between RMMC and ND Equipment; and (6) Owner's Management Agreement between RMMC and Jay Dee Sale.

30.     **Consignment Creditors** shall mean (1) BTS, Inc.; (2) Schogan Companies; (3) Mikota LLC; (4) Centerline Equipment LLC; (5) ND Equipment; and (6) Jay Dee Sale.

31.     **Consignment Equipment** shall mean the machinery and equipment owned by the Consignment Creditors that is the subject of the Consignment Agreements.

32.     **Consignment Claims** shall mean the claims of the Consignment Creditors.

33.     **Cowings** shall mean Owen Cowing and Linda Cowing, formerly husband and wife.

34.     **Creditor** shall mean "Creditor" as defined in Bankruptcy Code § 101(10) and will include every holder of a Claim, whether or not such Claim is an Allowed Claim.

35.     **Debtors** shall mean Red Mountain Machinery Company, an Arizona corporation, Red Mountain Holdings, LLC, an Arizona limited liability company, Red Mountain Pacific LLC, a California limited liability company and BTH, LLC, an Arizona limited liability company.

36.     **Dierich** shall mean Darren Dierich, and in the context of the Comerica/Dierich Litigation, shall mean Darren Dierich and Terri Dierich, husband and wife.

37.     **Disbursing Agent** shall mean the Reorganized Debtor, or such other person or entity specified in the Confirmation Order that will perform any duties of the Disbursing Agent as set forth in the Plan.

38.     **Disclosure Statement** shall mean the "Disclosure Statement For Debtors' Joint Plan Of Reorganization," in the form approved by the Bankruptcy Court or as it may be altered, amended, or modified thereafter from time to time.

39.     **Disputed Claim** shall mean every Claim that is not an Allowed Claim.

40.     **Disputed Interest** shall mean any interest in the ownership or membership of the Debtors as of the Filing Date that is the subject of any dispute as to the existence or validity of such interest.

41.     **Distribution Dates** shall mean the Initial Distribution Date and at least the first Business Day of each calendar quarter thereafter, or any other date on which the Debtors elect to or are required to make a distribution under the terms of the Plan.

42.     **Effective Date** shall mean the date selected by the Debtors that is at least 10 days after but no more than 45 days after the Confirmation Date, unless the Confirmation Order is stayed pursuant to an order of the Bankruptcy Court or another court of competent jurisdiction.  The Debtors shall designate the dated selected as the Effective Date in a written designation filed with the Court after the Confirmation Order is entered on the docket and on or before the Effective Date.

43.     **Employee Defendants** shall mean Robin Kain and Jane Doe Kain, husband and wife; Barry Fickett and Brenda Fickett, husband and wife; Amber R. Ocheltree and Jason Ocheltree, husband and wife; Troy Winger and Jenifer Winger, husband and wife; Equipment Professionals, Inc.; and HCMI Co.

44.     **Equipment** shall mean all machinery and equipment used in the Debtors' business, including without limitation, the items listed on **Exhibit B** hereto.

45.     **Executory Contract** shall mean every unexpired lease and other contract that is subject to being assumed or rejected under Bankruptcy Code § 365.

46.     **Existing Equity Administrative Claims** shall mean and all advances, loans or claims incurred by the Cowings on behalf of the Debtors since the Filing Date as allowed by the Court.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

47. **Existing Equity New Value Contribution** shall mean the total of all cash contributions made by the Cowings or each of them to the Debtor as provided in the Plan, including the forgiveness of any allowed Administrative Claims held by the Cowings against the Estate.

48. **Filing Date** shall mean August 11, 2009, being the date on which the Debtors filed their voluntary petitions in the United States Bankruptcy Court for the District of Arizona under Chapter 11, Title 11 of the United States Code.

49. **Final Order** shall mean an order or judgment of the Bankruptcy Court which shall not have been reversed, stayed, modified or amended, and as to which the time to appeal from or to seek review or rehearing of, shall have expired, and as to which no appeal or petition for review, or rehearing is pending, or if appealed from, shall have been affirmed and no further hearing, appeal or petition can be taken or granted, or as to which no stay has been entered to affect the operative provisions of such order of judgment.

50. **GE** shall mean GE Commercial Distribution Finance Corporation, a Delaware corporation, a party to participation agreements with Comerica Bank.

51. **General Unsecured Claim** shall mean every Unsecured Claim that will be classified and paid under the Plan, and which is not an Administrative Expense Claim, Priority Unsecured Claim, or a Claim classified within any other Class under this Plan.

52. **Initial Distribution Date** shall mean the first date on which any payment under the Plan is made, which shall be no later than the 30th Business Day following the Effective Date.

53. **Litigation Proceeds** shall mean any and all monies received by the Debtors on account of prevailing on or settling the Claims asserted by Debtors in the Comerica/Dierich Litigation.

54. **Moors & Cabot** shall mean Moors & Cabot Investments, its employees and agents.

55. **Net Profits** shall mean all cash revenues actually received by the Reorganized Debtor from sales and/or rentals of the Debtors' Equipment, less all costs of sale and operating expenses of the Reorganized Debtor including, but not limited to, tax payments, debt payments and any minimum payments required under the terms of the Plan.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

56. **New Equity Contribution** shall mean approximately $1.5 million in cash contributions made by the New Equity Holders on or before the Effective Date.

57. **New Equity Holders** shall mean the members of the Reorganized Debtor.

58. **Plan** shall mean the Joint Plan of Reorganization filed by the Debtors on December 9, 2009, along with every modification or amendment thereof or thereto.

59. **Plan Expense Reserve Fund** shall mean a sum of money to be reserved for the payment of expenses relating to the administration of the Reorganization Case, including without limitation the claims of the Debtors' professionals, court costs and any fees owed to the Office of the United States Trustee. The Plan Expenses Reserve Fund shall be funded on the Effective Date with proceeds from the New or Existing Equity Contributions in an amount specified in the Confirmation Order, and thereafter disbursed in accordance with the Plan and any applicable further Orders of the Court.

60. **Priority Employee Claim** shall mean every Unsecured Claim against the Debtors that is not an Administrative Expense Claim, a General Unsecured Claim or a Secured Claim, and which is asserted by the Creditor holding such Claim to be entitled to priority under Bankruptcy Code § 507(a)(4) and (5).

61. **Priority Tax Claim** shall mean every Unsecured Claim against the Debtors that is not an Administrative Expense Claim, a General Unsecured Claim or a Secured Claim, and which is asserted by the Creditor holding such Claim to be entitled to priority under Bankruptcy Code § 507(a)(8).

62. **Reorganization Cases** shall mean the cases commenced by the Debtors' filing of voluntary petitions on the Filing Date.

63. **Reorganized Debtor** shall mean the Debtors after substantive consolidation and the Effective Date, as they emerge from chapter 11 as a single newly-formed limited liability company, the members of which will be the New Equity Holders and the Existing Equity Holders in accordance with their new equity contributions and the terms of the Plan.

{02471.002/00130669.DOC /}

64. **RMLV Properties** shall mean RMLV Properties, LLC, a Nevada limited liability company.

65. **RMMC** shall mean Red Mountain Machinery Company, an Arizona corporation.

66. **RMMC Properties** shall mean RMMC Properties, L.L.C., an Arizona limited liability company.

67. **Robin Kain** shall mean the person named as a defendant in the Comerica/Dierich Litigation and an employee of Comerica.

68. **Secured Claim** shall mean every Claim against the Debtors (including every secured portion of a Claim which is not fully secured) that is asserted by the Creditor holding such Claim to be secured by a lien, security interest, or assignment encumbering property in which the Debtors hold an interest; provided, however, that such Claim will be a Secured Claim only to the extent of the validity, perfection, and enforceability of the claimed lien, security interest, or assignment and only to the extent of the value of the interest of the Creditor holding such Claim against such property of the Debtors.

69. **Secured Creditor Reserve Fund** shall mean a separate bank account or escrow account to be created by the Disbursing Agent after the Effective Date into which the Reorganized Debtor shall make any and all payments on account of the Allowed Class 2 Comerica Secured Claim as may be required under the Plan, from which the Disbursing Agent shall make distributions to the holder of the Comerica Secured Claim as provided for in the Plan and the Confirmation Order.

70. **Secured Interest Value** shall mean the value of any Claimant's lien or security interest in property of the Debtors, which shall be equal to the lesser of: (a) the Claimant's Allowed Secured Claim; or (b) value of all property of the Debtors securing such claim, valued based on the use for which the Reorganized Debtor intends to use such property, less the value of any security interests of higher priority in the same property held by other Claimants.

71. **Secured Tax Claim** shall mean the claims filed by Pima County, Arizona, San Diego County, California, Maricopa County, Arizona, Riverside County, California (against Debtor RMMC), and Riverside County, California (against Debtor BTH).

72.     **Standstill Agreement** shall mean the "Agreement Governing Settlement Discussions, Standstill and Notice of Sale" executed by the Debtors and Comerica on June 24, 2009, and any amendments and/or extensions thereto.

73.     **Texas Guarantor Litigation** shall mean Case No. 3:09-CV-01492-F in the United States District Court for the Northern District of Texas, titled *Comerica Bank, Plaintiff vs. Red Mountain Machinery Company, Red Mountain Pacific, LLC, Red Mountain Holdings LLC, BTH, LLC, Owen Cowing and Linda Cowing, Defendants.*

74.     **Unsecured Claim** shall mean every Claim against the Debtors, regardless of the priority of such Claim, which is not a Secured Claim.

75.     **Unsecured Claims Fund** shall mean a fund established by the Debtors on the Effective Date, to be funded in the amount of $100,000.00 from New Equity Contributions or Existing Equity New Value Contributions, from which payments to certain creditors shall be made under the Plan.

# VI.     BACKGROUND AND DESCRIPTION OF THE DEBTORS

## A.     Background on the Debtors and Ownership.

Debtor Red Mountain Machinery Company is an Arizona corporation ("RMMC") with its principal place of business in Chandler, Arizona.  RMMC's co-debtor affiliates are Red Mountain Pacific, LLC, a California limited liability company ("Pacific"), BTH, LLC, an Arizona limited liability company ("BTH"), and Red Mountain Holdings, LLC, an Arizona limited liability company ("Holdings" and together with Pacific and BTH, the "Affiliates").  The Affiliates were originally established as holding companies for certain equipment and inventory used in the operation of the Business.  Pacific and BTH continue to hold title to certain equipment assets.  Holdings has no assets.

RMMC is one of the premier heavy equipment and earthmoving rental companies in the Southwestern United States.  With an initial investment of $2,000 and a rental fleet of four (4) consigned machines, Owen Cowing founded RMMC in 1986 and opened its first location in Gilbert, Arizona with his former spouse, Linda Cowing.  RMMC has enjoyed significant growth and success over the years primarily due to its long established relationships with its customers, its reputation

providing the quality customer service and equipment, and the depth of experience of RMMC's management team. In particular, RMMC's equipment maintenance standards, which include RMMC's strict adherence to a regularly scheduled maintenance program and a thorough maintenance review and repair of each piece of equipment upon its return from lease, are recognized as unmatched in the industry. RMMC's maintenance standards have resulted in prolonged lives of its equipment and provide the basis for its long lasting customer relationships.

In 1996, after substantially expanding its fleet and operations in Arizona, widespread growth in the construction industry led RMMC to expand into Southern California where it built and operated a leasing and sales facility in Escondido, California. In 2006, RMMC sold its Escondido facility and moved its California operations to a leased facility in Riverside, California. In 2001, RMMC further expanded its operations into the Las Vegas, Nevada area and enjoyed several years of growth and success in that booming economy. At the height of its success, RMMC and its affiliates owned more than 300 machines, employed more than 140 people, and produced gross revenues of more than $43 million.

During the Debtors' expansion phases, affiliates RMMC Properties and RMLV Properties held title to the Debtors' offices/equipment yards in Arizona and Nevada, respectively. Each of these entities has served in the capacities as the Debtors' landlords for those equipment yards. Both RMMC Properties and RMLV Properties have received intercompany loans from Debtor. Although RMMC has listed said loans as assets in its bankruptcy schedules, RMMC Properties and RMLV Properties are insolvent and RMMC does not anticipate recovering any monies on account of its intercompany claims.

RMMC's shareholders, officers and directors are Owen Cowing and Linda Cowing, both of whom are also the members of Affiliates. The Cowings founded RMMC during their marriage. The Cowings have since divorced but continue to manage RMMC's business together in their roles as President and Secretary, respectively, and in consultation with RMMC's Chief Restructuring Officer, Dave Gonzales.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Owen Cowing graduated from the South Dakota School of Mines and Technology with a degree in mechanical engineering. He now has more the 40 years of experience in the construction industry, including 23 years serving as RMMC's President. In that capacity, Mr. Cowing has purchased and sold thousands of pieces of equipment throughout RMMC's 23 years in business.

Mr. Cowing started his career with a major equipment manufacturer, then working for Empire Machinery and later for a Phoenix-based grading and paving contractor prior to founding RMMC. Cowing's unwavering work ethic was developed in his youth when he began working with his father on his family farm in South Dakota. Mr. Cowing credits his father's example of meticulously maintaining the farming equipment as his first lesson in critical keys to success.

Indeed, RMMC prides itself on its methodical inspections and service that its machines receive before they are added to the fleet or delivered to a customer. With Mr. Cowing's experience as a contractor, he is sensitive to the needs and pressures of his clients and what downtime costs them. He understands his clients' commitment to projects, production rates, completion dates and the importance of cash flow. So, Mr. Cowing and RMMC do everything they can to make sure that RMMC's equipment does not hold up the line. Mr. Cowing's leadership and commitment to providing quality equipment has made RMMC a client favorite and a leader in the machine rental industry.

B.     **Equipment Leasing and Sales.**

RMMC is in the "dirt-moving" business and primarily rents large Caterpillar equipment. RMMC's leasing of its equipment is virtually all business-to-business with licensed contractors, making it stand apart from the typical equipment rental companies, which primarily focus on rentals to homeowners for small jobs. RMMC's customers include developers of commercial and residential properties and infrastructure contractors that use the equipment for, among other things, earth moving and grading, underground sewer and water, paving, building and widening freeways, mining, and sand and gravel work. Because of the nature of its business, RMMC's receivables are most often secured by statutory lien rights afforded to lessors of

{02471.002/00130669.DOC /}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1 construction equipment.

2       The smallest of RMMC's machines weighs over 30,000 pounds, and a typical

3 earthmoving unit can weigh 150,000 pounds. RMMC buys used equipment, puts it through its rigid

4 inspection and service practices, and rents the equipment to the construction industry. RMMC also

5 rents certain equipment on a consignment basis. Under such arrangements, RMMC leases equipment

6 to its customers that is owned by third parties and currently shares in the rental revenues generated

7 therefrom on an 80/20 (80% owner/20%) split basis, after deduction for maintenance, repairs and

8 expenses. RMMC's consignment business has been and continues to be a profitable component of

9 RMMC's business model.

10       As described above, RMMC's historical success can be attributed to Owen Cowing's

11 commitment to rigid maintenance and repair standards. Indeed, RMMC spends almost one quarter of

12 its rental revenue on maintenance of its machines, which makes mechanical excellence one of the

13 RMMC's top selling points. RMMC's yard in Chandler, AZ is equipped with a state-of-the-art

14 maintenance facility that includes two 5-ton cranes, which allow RMMC to pull components like

15 engines, transmissions and bulldozer blades out of equipment for maintenance and repair and an

16 equipment washing facility, including facilities to process and clean water waste and runoff from the

17 washing unit. In addition, all of RMMC's equipment is equipped with electronic tracking systems

18 that provide RMMC with daily usage reports. This electronic system tracks and alerts RMMC as to

19 when any scheduled preventative maintenance may be required.

20       Shortly after the Filing Date, RMMC retained Ritchie Bros. Auctioneers ("Ritchie

21 Bros.") to appraise its equipment fleet. Upon information and belief, Ritchie Bros. is the world's

22 largest industrial auctioneer, selling more equipment to on-site and online bidders than any other

23 company in the world. At that time, Ritchie Bros. prepared a liquidation proposal for the Debtors in

24 which it offered to purchase the Debtors' fleet for $13,800,000 at auction. A true and correct copy of

25 Ritchie Bros.' August 24, 2009 proposal is attached hereto as **Exhibit C**. In October 2009, the

26 Debtors sold approximately one-half of their equipment to Comerica via a credit bid of $7 million

27 after Ritchie Bros. proposed to purchase the same equipment for $5,040.000. The Debtors currently

estimate the remaining equipment to have a liquidation value of approximately $7.5 million.

C.     **Comerica Loan.**

As more fully detailed in Section VIII below, on June 23, 2003, the Debtors obtained a loan in the form of a revolving line of credit (the "Loan") from Comerica pursuant to the terms of a promissory note and a credit agreement (the "Loan Agreement") executed contemporaneously therewith. The Loan Agreement has since been amended several times and currently evidences an obligation of the Debtors to Comerica in the maximum principal amount of $33,000,000.00. The promissory note is secured by a security agreement, pursuant to which the Debtors granted Comerica a security interest in substantially all of its assets.

D.     **Events Leading to Filing of Bankruptcy.**

In the spring of 2008, RMMC's decreased revenues resulted in its default of certain non-monetary obligations under the provisions of the Comerica Loan Agreement and the Debtors began workout discussions with Comerica. Those discussions resulted in a cash infusion of $3 million by the Cowings, which was used to pay down the balance on the Comerica Loan, and a series of forbearance and standstill agreements between the parties that have required, among other things, weekly authorization from Comerica for the Debtors' use of operating funds and payment of expenses. In addition, the Debtors instituted across-the-board cost cutting measures, including the layoff of a significant portion of its workforce and the sale of assets. Notwithstanding such efforts, however, the Debtors were unable to keep up with the unprecedented downturn in the construction industry and the resulting slide in the value of its equipment, which provided the primary security for the Comerica Loan.

In or about May 2008, Owen Cowing was diagnosed with leukemia and, as a result, transitioned the primary responsibility of negotiating a workout with Comerica to Darren Dierich, RMMC's then Chief Financial Officer. Dierich continued to have primary responsibility for communications with Comerica when Cowing returned to work part-time in or about September 2008. Throughout this time, Dierich counseled and advised Mr. Cowing that no refinance or workout solution with Comerica could be obtained. In early 2009, at the demand of Comerica and in an effort

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

to maintain a cooperative working relationship with Comerica, the Debtors began to wind down their business operations and substantially reduce the amount of equipment on lease to customers. On or about June 9, 2009, Owen Cowing discovered a notice published in a trade journal announcing Comerica's sale of RMMC's equipment by a private UCC sale. Comerica had not provided the Debtors with any formal notice of its planned private sale prior to Cowing's discovery of the published notice.

Concerned about the quality of management and advice being provided by Dierich, RMMC retained Dave Gonzales and Caliber Advisors as its financial consultant and workout advisor in order to assist with its discussions with Comerica and/or develop alternative restructuring plans. Since that time, the Cowings have been managing the Debtors' interests with the participation and input of Mr. Gonzales. In reviewing company records, Mr. Gonzales and the Cowings discovered secret communications between Dierich and Comerica indicating that Comerica intended to sell the business via private sale to an entity owned and controlled by, among others, Dierich (the "Dierich Sale"). Neither Dierich nor Comerica ever informed the Debtors of the pending Dierich Sale.

On information and belief, the Dierich Sale was negotiated between Dierich and Comerica in secret while Dierich was employed by RMMC and responsible for the Debtors' own negotiations with Comerica. Indeed, in its subsequent investigation of Dierich's actions, Mr. Gonzales and the Cowings discovered numerous email communications between Dierich and Comerica's loan officer, Robin Kain, wherein such parties expressly acknowledged the secretive nature of their conspiracy to defraud the Debtors and keep the terms of their agreement secret from the Cowings.

The terms of the Dierich Sale, as they are understood by the Debtors, generally contemplated a minimal equity investment by Dierich with the remaining purchase price to be financed by Comerica and GE.[1] Immediately upon discovering this information, Owen Cowing removed Dierich from his position as CFO and transitioned his responsibilities to Mr. Gonzales. On

---

[1] The Debtors' claims with respect to the actions taken by Dierich, Comerica, GE, and the Employee Defendants is the subject of the Comerica/Dierich Litigation. All such claims are preserved under the Plan for the benefit of the Reorganized Debtor.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

June 26, 2009, the Debtors and their principals formally advised Comerica as to the conduct it had discovered and provided Comerica with evidence supporting substantial claims that the Debtors and their principals may have against Comerica in connection with its role in the Dierich Sale scheme.

As part of what appeared to be an attempt to find a consensual resolution of these issues, the Debtors and Comerica entered into a Standstill Agreement whereby Comerica agreed to stay the Dierich Sale and provide the Debtors sufficient notice prior to conducting any sale of the Debtors' assets or commencing any litigation against the Debtors or their principals (the "Standstill Agreement").

During the pendency of the Standstill Agreement, the Debtors continued to operate with collection and payment oversight by Comerica. This oversight process, which had been in place for several months prior to the Filing Date, generally required the Debtors to submit a budget to Comerica on Monday or Tuesday of a given week for approval of that same week's projected expenses. Operating under this agreement necessarily required the Debtors to incur expenses, including payroll and vendor obligations, in advance of Comerica's formal authorization to pay such obligations. Until early August 2009, Comerica routinely approved the payment of the Debtors' expenses in such a manner and this arrangement never presented an issue for the Debtors.

However, on or about August 7, 2009, without any notice at all or any apparent change in circumstances, Comerica advised the Debtors that it would not approve payment of the Debtors' weekly expenses that would otherwise have been paid on that date. On August 9, 2009, without any notice to the Debtors and in violation of the Standstill Agreement, Comerica initiated the Texas Guarantor Litigation and named the Debtors as co-defendants.[2] Comerica's unilateral decision not to fund the Debtors' expenses meant that the Debtors would be unable to fund payroll for services previously provided by employees and/or pay trade creditors. As a result of the above, the Debtors were forced to file these Reorganization Cases.

---

[2] Upon the Debtors' filing of bankruptcy, Comerica voluntarily dismissed its claims against the Debtors in the Texas Guarantor Litigation. The Debtors' claims against Comerica for breach of the Standstill Agreement are the subject of the Comerica/Dierich Litigation.

## VII.    **DEBTORS' ASSETS**

### A.    **Yellow Iron.**

In 2005, the Debtors ran a fleet of approximately 350 owned and consigned machines in three states. In 2007 and 2008, while overall reduction in construction activity reduced the demand for equipment, the Debtors sold more than 100 pieces of equipment, and as of the Filing Date owned approximately 180 items of major equipment.

The heavy equipment falls into several different types of categories. There are motor graders, which perform road finishing work, and hydraulic excavators used for underground construction such as sewer and water, bridge work and truck loading. Two types of scrapers are in Debtors' fleet, self loading scrapers, and conventional scrapers, which are loaded by being pushed by tractors. The equipment includes water tankers for dust control and large four-wheel dirt compactors and vibratory, smooth drum and pad foot compactors used for compacting granular materials. The Debtors also own bulldozers and articulated trucks, which are off-highway trucks used for longer hauls. Some of Debtors' smaller equipment include water wagons, hurricane pumps, buckets, rock hammers that attach to trucks, and elevating scrapers that move dirt without the need for any other equipment. As of the Filing Date, RMMC and Pacific valued their share of the entire fleet of equipment at $11,101,744.19; BTH valued its proportionate share of the fleet at $2,921,511.63, and Holdings (having only parts in its name) valued its proportionate share of the fleet at "Unknown."[3] In addition to the heavy equipment and parts, RMMC valued equipment supplies, tires, red fuel supply, rebuild WIP, etc. at $398,483.46 as of the Filing Date. As more fully described herein, the Debtors have sold certain equipment in a post-petition, court-approved sale, leaving the Debtors with approximately 111 pieces of equipment, including 86 large machines, plus almost 200 related machine attachments. The current ownership of the remaining equipment is reflected on **Exhibit B**.

---

[3]    These values also included the Debtors' office equipment, furnishings and supplies used in the operation of the business.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

B.     **Consignment Equipment.**

As of the Filing Date, RMMC had approximately 31 pieces of the Consignment Equipment for lease pursuant the Consignment Agreements and similar agreements executed between RMMC and the Cowings.  A complete listing of the equipment owned by the Cowings and the Consignment Creditors is attached hereto as **Exhibit D**.

The Consignment Creditors each recorded UCC financing statements and assert a security interest in revenues generated by RMMC pursuant to the Consignment Agreements.  However, the Debtors note that the Consignment Agreements do not include express language purporting to grant a security interest to the Consignment Creditors.  Therefore, the exact nature of the Consignment Creditors' interests in revenues generated by RMMC pursuant to the Consignment Agreements is subject to legal dispute.  Unless such dispute can be resolved by the terms of this Plan or mutual agreement of the parties, the Debtors anticipate additional litigation with some or all of the Consignment Creditors.

C.     **Accounts Receivable.**

As of the Filing Date, RMMC had outstanding accounts receivable from third parties of approximately $1,871,324.20.[4]  RMMC also is owed intercompany receivables from BTH in the amount of $603,910.09, from RMMC Properties in the amount of $37,691.34, and from RMLV Properties in the amount of $440,611.60.  Debtor Pacific is owed an intercompany receivable from RMMC in the amount of $109,357.38.  These intercompany receivables and payables are not reflective of cash transactions between the Debtors but merely represent accounting entries made for the purpose of tax and depreciation allocation among the Debtors.

D.     **Other Personal Property.**

As of the Filing Date, RMMC had nominal cash ($11,101.16) in Comerica bank accounts, which was subsequently swept by Comerica and set off against amounts due and owing under the Comerica Note.  Debtors had approximately $146,673.23 in business checking accounts

---

[4]     Amount includes approximately $1.2 million of accounts receivable that was determined to be uncollectible prior to the Filing Date.

with Wells Fargo Bank and $76,831.00 with Marshal & Ilsley Bank.  Holdings had only $150.39 in an operating account with JPMorganChase Bank.

The State of Nevada held a tax security deposit of $2,065.25 and the City of Chandler held a water hydrant deposit of $755.00.  A landlord, Michael Madrid, held a rental deposit of $14,000.00.  Southwest Gas Corp. held a $650.00 deposit.  Finally, a law firm, Clausen Law Group, held a tax planning retainer of $7,409.50.

RMMC and Pacific hold rights to purchase Maintainer products under a dealer agreement executed by Debtor Holdings.  Holdings listed the actual Dealer Agreement as an asset with an "Unknown" value.  Maintainer products are customized mechanic service truck bodies and lube truck bodies, and extendable boom cranes.  The Debtors have been unable to determine a tangible value for these rights and is no longer actively operating as a dealer.  Holdings listed certain dealer motor vehicle plate licenses (total of 4) as an asset and is unable to estimate a tangible value for these plates.

RMMC owns a proprietary customer list as an asset and is unable to estimate a tangible value for this proprietary information.  RMMC also listed potential recovery in lawsuits against others (A/R collections) as an asset as of the Filing Date, but cannot place a value on these contingent and unliquidated claims.

## VIII.    DEBTORS' DEBT STRUCTURE

A.    **Comerica Note, Credit Agreement, Security Agreement and Forbearance.**

The Collateral is encumbered by the lien of Comerica, which originated as security for Debtors' payment to Comerica of a loan in the maximum principal amount of $33,000,000.  The loan and lien were memorialized by, without limitation, the following documents:

- Master Revolving Note dated June 2, 2003 in the amount of $10,000,000  This promissory note was amended by the First through the Ninth Amendments to same, the Ninth Amended and Restated Master Revolving Note being dated September 4, 2008 in the amount of 32,173,000 (collectively, the "Comerica Note").

- Credit Agreement dated June 2, 2003 ("Comerica Credit Agreement").

- Security Agreement dated June 2003 ("Comerica Security Agreement). This agreement was amended by the First Amended and Restated Security Agreement (Comprehensive) dated May 19, 2005 (collectively, the "Comerica Security Agreement").

- First Amendment to Loan Documents dated May 21, 2004 (amending Comerica Credit Agreement and Comerica Security Agreement). Debtors executed eight further amendments to the Loan Documents (collective, the "Comerica Loan Documents").

- Limited Forbearance Agreement dated June 1, 2008. This agreement was amended by the First Restated Limited Forbearance Agreement dated August 4, 2008 and the Second Restated Limited Forbearance Agreement dated September 4, 2008 (collectively, the "Comerica Forbearance Agreement").

As of the Filing Date, Comerica claimed that Debtors owed $31,344,000 under the Comerica Note. This debt has been reduced by $7,000,000 in accordance with the sale of certain of Debtors' equipment to Comerica, leaving a balance due of approximately $24,344,000 (sale discussed in Section XI.D. below).

B.   **Secured Property Tax Claims**

Certain municipalities have filed proofs of claim for the portions of Debtors' tax obligations which are secured by Debtors' Equipment. They are:

| | |
|---|---|
| Pima County, Arizona | $  3,500.00 |
| San Diego County, California | $  6,619.65 |
| Maricopa County, Arizona | $ 17,372.73 |
| Riverside County, California | $  1,783.02 (Debtor RMMC) |
| Riverside County, California | $    563.60 (Debtor BTH) |

C.   **Priority Unsecured Tax Claims.**

Priority tax claimants have filed proofs of claim, as follows:

| | |
|---|---|
| Arizona Dept. of Revenue | $  5,697.62 |
| Utah State Tax Commission | $  9,093.86 |
| Internal Revenue Service | $ 39,308.50 (Debtor RMMC) |

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Engelman Berger, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Internal Revenue Service $144,353.06 (Debtor Holdings)

**D.** **Priority Unsecured Employee Wage and Benefit Claims.**

As of the Filing Date, Debtors owed Paid Time Off ("PTO") wages to various employees in the total amount of $12,493.17.

**E.** **Consignment Claims**.

The Debtors identified Consignment Claims of $142,086.00 in their schedules, including claims of BTS, Inc., ND Equipment, Jay Dee Sale, Linda Cowing and Owen Cowing. As of the date of this Disclosure Statement, BTS, Inc. has filed a Claim in the amount of $31,601.44, Schogan Companies has filed a Claim in the amount of $158,649.65, and Jay Dee Sale has filed a claim in the amount of $5,603.00. In addition to monetary claims, the Consignment Claims are impaired by the modification of the Consignment Agreements as provided in Section XII below.

**F.** **General Unsecured Claims**.

As of the Filing Date, Debtors were obligated to various trade creditors, and certain tax obligations were unsecured. Creditor U.S. Bank N.A. filed a claim in the amount of $1,263,308.27, for Debtors' guarantee of certain obligations. As of the date of this Disclosure Statement, unsecured claimants have filed claims totaling $1,537,408.27.

**G.** **Existing Equity Interests**.

The Cowings are the sole shareholders and members of the Debtors with each holding a 60% and 40% interest in each, respectively.

**IX.** **POTENTIAL AVOIDANCE ACTIONS**

The Debtors' bankruptcy schedules fully disclose certain prepetition payments to insiders or affiliates of the Debtors, as well as certain pre-petition payments to third-parties. The Debtors do not anticipate the filing of avoidance actions under Section 544 *et seq.* of the Bankruptcy Code, and do not believe that such actions would be likely to result in any significant recovery for the Unsecured Creditors in light of the collectability of any judgment and the administrative cost of pursuing such actions. A list of the Debtors' prepetition transfers is attached hereto as **Exhibit E.**

{02471.002/00130669.DOC /}

## X.  OTHER LITIGATION

The Debtors are actively pursuing or involved in the following litigation:

### A.  The Comerica/Dierich Litigation.

The Debtors have filed the Comerica/Dierich Litigation which asserts various claims and actions against Comerica, Dierich, and the Employee Defendants.  Without limiting the substance of the Complaint, the Debtors' claims and actions may be summarized as follows:

1.  Debtors assert defenses, offsets, recoupment, claims, causes of action and counterclaims against Comerica for its failure to comply with the terms of the Standstill Agreement and refusal to fund Debtors' weekly budgets.  These matters are currently asserted in the Comerica/Dierich Litigation, and could be asserted in any claims litigation with Comerica, as well.

2.  Debtors assert defenses, offsets, recoupment, claims, causes of action and counterclaims against Dierich and the other Employee Defendants for breaching their fiduciary duties to Debtors.  These matters are also asserted in the Comerica/Dierich Litigation, and could be asserted in any claims litigation with Dierich and the Employee Defendants, as well.

3.  Should Comerica, Dierich or any of the Employee Defendants file a proof of claim in this Bankruptcy Case, the Debtors will oppose and object to the proofs of claim based upon the facts and theories asserted in the Comerica/Dierich Litigation.

### B.  Collection Litigation.

Prior to the Filing Date, the Debtors regularly employed certain attorneys to render services relating to collection of the Debtors' accounts receivable.  These attorneys brought suit against various account debtors in six different states to collect approximately $2.8 million in accounts receivable.  The Bankruptcy Court has approved the Debtors' continued use of these collection attorneys to prosecute the collection litigation.  See **Exhibit A** for a list of the pending collection matters.

## XI.  DEBTORS' ACTIONS AND SIGNIFICANT POST-FILING EVENTS

The Debtors have made concerted efforts to implement promptly their reorganization in the Reorganization Cases.  In that regard, the Debtors have taken considerable action in the

Reorganization Cases since the Filing Date, including but not limited to the following:

A. **Administration of the Reorganization Case In General.**

- Filed an appropriate motion and gained the Court's approval to retain experienced bankruptcy counsel to represent Debtors in the jointly-administered case, as well as special litigation counsel to prosecute the Comerica/Dierich Litigation;

- Obtained Court approval to retain a valuation expert to assist in the cash collateral hearings (discussed in detail in Section B below);

- Compiled and filed with the Court the Statements of Financial Affairs and Schedules of Assets and Liabilities;

- Attended the initial interview with the United States Trustee's Office;

- Opened new post-petition bank accounts;

- Attended and testified at the first meetings of creditors on September 15, 2009;

- Filed appropriate monthly operating reports;

- Filed a proposed Plan of Reorganization and Disclosure Statement within the period set by the Court and within the exclusivity period;

- Obtained Court approval to pay certain legal professionals in the ordinary course of business to proceed with collection litigation in which the potential recovery to the estates could be $2.8 million; and

- Obtained a Court order setting the claims bar date to expedite plan submittal and confirmation.

B. **Cash Collateral Issues and Post-Petition Operations.**

Debtors' emergency motion for authorization to use cash collateral on August 13, 2009 was met by opposition of Comerica. However, following the Court's granting of interim use of cash collateral and an evidentiary final hearing on same, the Court ruled that Comerica was adequately protected and authorized Debtors to use Comerica's cash collateral through 5:00 pm on October 23, 2009.

{02471.002/00130669.DOC /}

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Debtors filed their second motion for authorization to use the cash collateral on October 19, 2009, which was also met by opposition of Comerica. The parties reached an interim agreement for use of cash collateral through 5:00 pm on November 16, 2009, at which time the parties were to appear for a final hearing. Following depositions, discovery and preparation for the final evidentiary hearing, and just prior to the final hearing, the parties reached a settlement. The parties filed an Agreed Order authorizing Debtors' continued use of Comerica's cash collateral through January 15, 2010. However, that Agreed Order also set forth that Debtors file their Plan of Reorganization by December 9, 2009. This Agreed Order also settled the parties' dispute regarding Comerica's motion for appointment of a chapter 11 trustee (discussed below).

C.     **Comerica's Trustee/Conversion Motion.**

Comerica filed its "Motion for Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code" and subsequently filed "Comerica's Amended Motion for Appointment of A Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code or, in the Alternative, to Convert Debtors' Cases to Chapter 7 Pursuant to Section 1112 of the Bankruptcy Code" (collectively, the "Trustee/Conversion Motion"). By the Trustee/Conversion Motion, Comerica alleged that Debtors were showing substantial and continuing operating losses and were engaging in a futile attempt to reorganize for the benefit of the Debtors' insiders, to the detriment of Comerica and other creditors. The Debtors responded to the Trustee/Conversion Motion contending that Comerica could not carry its burden of proof that a trustee should be appointed; Comerica relied upon assumptions and allegations that were contradicted by undisputed evidence and Court findings; appointment of a trustee was not in the best interest of creditors; and no grounds existed to convert the cases. Following lengthy discovery, depositions and hearing preparation, the parties reached a settlement, and Comerica agreed to not pursue its Trustee/Conversion Motion so long as the Debtors filed their Plan of Reorganization by December 9, 2009.

D.     **Sale of Equipment.**

On September 24, 2009, the Debtors filed a motion seeking entry of an order authorizing the Debtors to sell certain of the Debtors' machinery and equipment pursuant to § 363 of

{02471.002/00130669.DOC /}

Title 11 of the United States Code and Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure to Ritchie Bros. free and clear of all liens, claims and encumbrances (the "Sale").

Comerica filed its objection to the Sale on September 28, 2009 (the "Objection"). Through its Objection, Comerica argued that the Debtors should not be authorized to sell the Equipment because Comerica does not consent to the Sale and the Debtors cannot otherwise satisfy the requirements of § 363(f) of the Bankruptcy Code. In addition, Comerica submitted a credit bid in the amount of $7,000,000 for the purchase of the Equipment.

The Court conducted a hearing on the Sale motion and the Objection on September 29, 2009. At the hearing, the Debtors and Comerica advised that, subject to Court approval, the parties had reached an agreement for the Sale of the equipment to Comerica for $7,000,000 in the form of a credit bid. No other parties appeared at the hearing to object or present competing bids. Thus, the Court approved the parties' agreement and the sale was thereafter completed. Comerica's claim against the Debtors has, thus, been reduced by $7,000,000.

E.     **The Comerica/Dierich Litigation.**

Based upon the Debtors' allegations that Comerica, Dierich and the Employee Defendants had conspired to defraud the Debtors (Section VI.D., *supra*), that Comerica had breached its implied covenant of good faith and fair dealing and breached the Standstill Agreement with the Debtors, and that Dierich and the Employee Defendants had breached fiduciary duties to the Debtors, the Debtors filed an adversary complaint against Comerica, Dierich and the Employee Defendants, commencing Case No. 09-00941-RJH. The Debtors have actively prosecuted the Comerica/Dierich Litigation. All defendants have been served, and answers have been filed by Dierich, Comerica and Robin Kain. Comerica filed a motion to dismiss the claims of the Cowings, which was denied. Certain Employee Defendants have filed a motion to dismiss the complaint, and oral argument on this motion is set for December 17, 2009. The Debtors intend to continue to actively prosecute the Comerica/Dierich Litigation.

## XII.   SUMMARY OF THE PLAN

### A.   Overview.

The Plan is premised on the reorganization of the Debtors to be funded by third party investors and by revenues generated from the Reorganized Debtor.  The Debtors project that over a 7-year period, the Reorganized Debtor will generate approximately $12 million in Net Profits that will be available to fund distributions on account of Allowed Claims of creditors.  The amount and timing of certain distributions under the Plan are dependent on future events, namely market factors facing the Reorganized Debtor and the outcome of the Comerica/Dierich Litigation.

Payments to Creditors and Interest holders will be made in accordance with the classification of Claims set forth in the Plan and summarized below.  The following sections summarize the Plan and its most salient provisions, but should not substitute for a full reading of the Plan.

### B.   Classification Of Claims And Interests.

#### 1.   Summary of Claims (anticipated and filed).

The Plan contemplates the substantive consolidation of the Debtors' Estates on or before the Confirmation Date.  As more fully discussed herein, claims asserted against each of the individual Debtors will be consolidated, to the extent Allowed, as Allowed Claims against the consolidated RMMC Estate.  The Bankruptcy Court has set a Claims Bar Date of December 7, 2009. The Plan contemplates that before a Claim will become an Allowed Claim: (1) the Creditor holding such Claim must file a timely proof of claim on or before the Bar Date; and (2) any timely Objections to such Claims must be resolved by a Final Order of the Bankruptcy Court.

To date, approximately 39 claims have been filed in the Cases.  The Claims Bar Date is only two days prior to the filing of this Disclosure Statement, so additional claims may gradually flow into the Debtors.  From a review of the filed claims to date and the Debtors' schedules, the Debtors' best estimate of the amount of claims that will be asserted in each Class are summarized in the chart below.  All claims remain subject to claims objections prior to the Claims Objection Bar

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Date.

A register of the actual claims filed as of the date of this Disclosure Statement is attached hereto as **Exhibit F**. As mentioned above, other claims may gradually flow in to the Debtors since the bar date has only recently passed, and thus, the total of the above-listed claims may change. The following chart summarizes the Debtors' estimates of claims by each Class created under the Plan.

| CLASS | TYPE OF CLAIMS | Estimated Claims |
|-------|----------------|------------------|
| 1 | Administrative Expense Claims | $300,000 |
| 2 | Comerica Allowed Secured Claim | TBD |
| 3 | Secured Property Tax Claims | $46,754.55 |
| 4 | Priority Employee Claims | $12,493.17 |
| 5 | Priority Tax Claims | $201,946.30 |
| 6 | Consignment Contract Holder Claims | $204,000.00 |
| 7 | Comerica Deficiency Claim | TBD |
| 8 | General Unsecured Claims | $1,500,000.00 |
| 9 | Existing Equity Interests | N/A |
| 10 | Equitable Subordination Claims | TBD |

**2.    Classification of Claims.**

All Claims and Interests are classified under the Plan as set forth in this Article. At the time of the confirmation hearing, any Class that does not contain an Allowed Claim (or a Claim temporarily or provisionally allowed by Bankruptcy Court for voting purposes) will be deleted from the Plan with respect to voting on confirmation of the Plan. The Classes of Claims under this Plan are as follows:

**Class 1 – Administrative Expense Claims**. Class 1 is comprised of all Allowed Administrative Expense Claims, including Claims of the Debtors' bankruptcy counsel and other professionals retained by the Debtors, unpaid United States Trustee's Fees, and any other Allowed Claims expressly approved by the Court under 11 U.S.C. § 503(b).

**Class 2 – Comerica Allowed Secured Claim.**

Class 2 is comprised of the Allowed Secured Claim asserted by Comerica. Comerica asserts or will assert that its Allowed Secured Claim is secured by a first lien on the Collateral, revenue

generated by the Equipment, and the Debtors' current and future Equipment leases, pursuant to the terms of the Comerica Loan Documents. Comerica asserts or will assert that its total indebtedness is in excess of $25,000,000.

Until an Order is entered allowing the Comerica Secured Claim and resolving the Comerica/Dierich Litigation, the Class 2 Claim is a Disputed Claim. The Class 2 Claim shall be subject to dispute by the Debtors as to amount and the extent of Comerica's security interests and claim priorities, which disputes and issues are summarized as follows:

a)     **Debtors' Disputes re Claim Amount**. The *amount* of the Allowed Secured Claim (and any Allowed Unsecured Claim) of Comerica is subject to the defenses, counterclaims, setoffs, recoupment rights and claims of the Debtors as asserted or to be asserted in the Comerica/Dierich Litigation;

b)     **Debtors' Disputes re Extent and Priority**. The *extent and priority* of the Comerica Allowed Secured Claim (and any Allowed Unsecured Claim) as between Comerica and other classes of Creditors and Equity Interests is subject to the claims of the Debtors as asserted or to be asserted in the Comerica/Dierich Litigation;

c)     **Valuation of Secured Claim**. The *amount* of the Allowed Secured Claim of Comerica is subject to the provisions of Bankruptcy Code § 506(a) in that it is limited to the value of the property of the Debtors in which Comerica holds a valid lien interest.

d)     **Adjudication of Comerica Allowed Secured Claim**. The Comerica Secured Claim will not become an Allowed Secured Claim until such time as the Court enters an order that has become a Final Order resolving the Comerica/Dierich Litigation. Such an adjudication is not likely to precede confirmation of the Debtors' proposed Plan. As set forth in the description of the treatment of the Allowed Class 2 Claim, the Debtors will establish a Secured Creditor Reserve for certain payments required under the Plan until the issues regarding the allowance of the Class 2 Claim are fully and finally resolved.

e)     **Estimation Proceeding**. Given the substantial unliquidated credits/offsets and adverse claims surrounding the Comerica Secured Claim, the Debtors reserve the right to commence

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

a proceeding under Bankruptcy Code § 502(c) for the estimation of the Allowed Comerica Secured Claim in connection with the hearing on Confirmation of the Plan, to ensure that the administration of this Cases is not unduly delayed on account of the disputes regarding the Comerica Allowed Secured Claim.

f) **Disallowed Class 2 Claims**.  Any portion of the Class 2 Claim that is Disallowed as a Class 2 Allowed Comerica Secured Claim but is otherwise an Allowed Claim shall be treated as a Class 7 Comerica Deficiency Claim or a Class 10 Equitably Subordinated Claim in accordance with any Court orders allowing such Unsecured Claims.

**Class 3 – Secured Property Tax Claims.**  Class 3 is comprised of the holders of Allowed Secured Claims arising out of the pre-petition assessment by any governmental unit of any ad valorem property tax, which such governmental unit contends is secured by a security interest or lien on the Equipment or other real or personal property of the Debtors.  The Debtors anticipate that the Claims asserted in Class 3 will total approximately $46,754.55, all of which is anticipated to be personal property tax claims.

**Class 4 – Priority Employee Claims.**  Class 4 is comprised of the holders of any Allowed Unsecured Claims entitled to priority pursuant to 11 U.S.C. §§ 507(a)(4) or (5) of the Bankruptcy Code.  The Debtors anticipate that the Claims asserted in Class 4 will total approximately $12,500.00.

**Class 5 – Priority Tax Claims.**  Class 5 is comprised of the holders of any Allowed Unsecured Claims entitled to priority pursuant to 11 U.S.C. § 507(a)(8) of the Bankruptcy Code.  The Debtors anticipate that the Claims asserted in Class 5 will total approximately $201,946.30.

**Class 6 – Consignment Claims.**  Class 6 is comprised of the Consignment Creditors.

**Class 7 – Comerica Deficiency Claim.**  Class 7 is comprised of the holder of any Allowed Comerica Deficiency Claim.

**Class 8 – General Unsecured Claims.**   Class 8 is comprised of any Allowed General Unsecured Claims other than the Allowed Comerica Deficiency Claim.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

**Class 9 – Existing Equity Interests.**  This Class comprised of the holders of the existing membership interests in the Debtors and includes any interest in the Debtors, as well as any rights or Claims asserted against the Debtors with regard to such Interests.

**Class 10 – Equitable Subordination Claims.**  Class 10 is comprised of all Allowed Claims or any portion thereof that are the subject of an Order entered by the Court that has become a Final Order that determines that the priority of such Allowed Claim shall be subordinated to any or all of the preceding Classes of Claims or Interests.

**XIII.**      **TREATMENT OF ALLOWED CLAIMS BY CLASS.**

The following is the description of the treatment proposed for the Claims by each Class of Creditors, Interest Holders, and holders of Administrative Expense Claims of the Estates as classified in the Plan.  Because the Plan contemplates substantive consolidation of the Estates on or before the date of the Confirmation Hearing (described in Section XVI below) and BTH, Pacific and Holdings have no third-party creditors other than Comerica, the Debtors have not separately classified the Claims against the Estates.  The Plan is intended to treat all Claims against the Estates of whatever character, whether or not contingent or liquidated, and whether or not allowed by the Court pursuant to Section 502(h) of the Bankruptcy Code.  However, only those Claims that are Allowed Claims under the Plan, and allowed pursuant to Section 502(a) of the Code, will receive payment under the Plan.

**Treatment of Class 1 – Administrative Expense Claims.**  Class 1 Allowed Claims shall be paid in full on the later of (1) the Effective Date, (2) the date on which such Claim becomes an Allowed Claim, or (3) the date that payment of such Allowed Claim is due under ordinary business terms.  In the event the Debtors do not have sufficient funds to pay all Allowed Administrative Expense Claims that are due in full on the Effective Date, any unpaid balance, upon prior agreement in writing by the holder of such Allowed Administrative Claim and Debtor, may be paid on an agreed deferred schedule.  Any such agreements shall be disclosed in writing prior to the Effective Date, and shall not prejudice the priority of such Allowed Administrative Claim in any further or other proceedings thereafter.  **Class 1 Claims are unimpaired and the holders thereof do not vote on the**

**Plan.**

**Treatment of Class 2 – Comerica Secured Claim.**

The Ballot will allow Comerica to elect alternative treatments under the Plan by selecting treatment under the Comerica Non-Settlement Plan Treatment or the Comerica Settlement Plan Treatment, as further described below. If Comerica fails to elect either of the alternative plan treatments, it will be deemed to have elected the Comerica Non-Settlement Plan Treatment. All Plan payments contemplated hereunder will be funded by the New Equity Contributions and Existing Equity New Value Contributions as contemplated under the Plan, and revenues and income generated by the Reorganized Debtor following the Effective Date.

**I.     Comerica Non-Settlement Plan Treatment.**

The Comerica Non-Settlement Plan Treatment option generally provides for the repayment of Comerica's Allowed Secured Class 2 Claim over varying periods of time, depending on whether or not Comerica elects to have its claim treated under § 1111(b) of the Bankruptcy Code. In the event that Comerica does not elect to have its claim treated under § 1111(b), this Section contemplates the repayment of Comerica's Allowed Secured Class 2 Claim, with interest, over a period of 10 years with any deficiency claim being paid and treated under Classes 7 and 10 as described below. In the event Comerica elects to have its claim treated under § 1111(b), this Section contemplates the repayment of Comerica's Allowed Secured Class 2 Claim over a period of 20 years and Comerica's waiver of any deficiency claim.

A.     **Disputed Claim.**   Until a Final Order is entered by the Court Allowing the Class 2 Claim and determining the amount thereof, and the validity, nature, priority and extent of any liens or other security for the Class 2 Claim, and whether any portion thereof is to be treated under Class 7 or Class 10 of this Plan, the Class 2 Claim shall be deemed a Disputed Claim.

B.     **Valuation Limitation**.   The Class 2 Allowed Claim shall be limited to the Comerica Secured Interest Value, less the value of any senior liens and Allowed Secured Claims having a higher priority.   In the event the Debtors and Comerica are not able to agree on the Secured Interest Value on or before the Confirmation Date, then Debtors may file a motion to value the secured

portion of Comerica's Allowed Claim pursuant to Bankruptcy Code § 502(b). The valuation issue may be determined at the Confirmation Hearing or at a separate hearing.

C. **Lien Retention**. To the extent determined by a Final Order arising out of the Comerica/Dierich Litigation, Comerica shall retain its lien interests in the Collateral as security for its Allowed Secured Claim, except that nothing contained herein shall grant Comerica an interest in any recoveries obtained by the Debtors in the Comerica/Dierich Litigation or on account of any other claims, rights or interest obtained by the Debtors or the Reorganized Debtor after the Filing Date. The Comerica Loan and Security Documents shall be superseded by terms of the Plan and shall be deemed modified to provide that: (i) all non-monetary defaults with respect to Financial Covenants, as that term is defined in the Loan Documents, are forever waived; (ii) in the event of any non-monetary or monetary default by the Reorganized Debtor, Comerica shall provide the Reorganized Debtor written notice of such default and opportunity to cure such default within 30 days of the date of any such written notice; (iii) choice of law shall be the laws of the State of Arizona; and (iv) choice of venue shall be the state or federal courts located in Maricopa County, Arizona. The Debtor reserves the right to document any amendments to the Loan Documents as may be appropriate to be made consistent with the terms of the Plan in documents that may be provided to Comerica prior to the Confirmation Hearing.

D. **Section 1111(b) Election**. As set forth in more detail below, if Comerica timely elects to be "fully secured" under Bankruptcy Code § 1111(b)(2), then the Secured Interest Value must still be determined for purposes of calculating interest payments due under the Plan, but the amount of the lien securing the Allowed Class 2 Secured Claim will not be limited to the Secured Interest Value, unless ordered otherwise in any Final Order(s) arising out of the Comerica/Dierich Litigation or the Confirmation Order. The mention of any valuation report, appraisal, or opinion of value in this Plan or in the Disclosure Statement shall not act to bind the Debtors or any other party to a particular valuation of the Collateral, which remains to be determined by agreement or by the Court.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

E.     **Payment of The Allowed Class 2 Secured Claim**.

1)     **Divided Claim**.   Unless Comerica is eligible to and timely elects in writing (*See* Fed.R.Bankr.P. 3008) to be "fully secured" by asserting its rights under Bankruptcy Code § 1111(b)(2), any Allowed Claims of Comerica in excess of the Allowed Class 2 Secured Claim shall be treated as a Class 7 General Unsecured Claim or a Class 10 Subordinated Claim.   The principal and interest on the Comerica Allowed Class 2 Claim shall be paid as set forth in this subsection *if* Comerica's Allowed Claim is valued and divided into an Allowed Secured Class 2 Claim and an Allowed Unsecured Deficiency Claim treated under Class 7 or a Subordinated Claim treated under Class 10.

a).     **Interest on the Allowed Secured Class 2 Claim**.   Commencing on the Effective Date, the Allowed Secured Class 2 Claim shall accrue interest at 3%.   Interest shall not be capitalized, and there shall not be interest assessed on the unpaid, accrued interest.

b)     **Payments on the Allowed Secured Class 2 Claim**.   Beginning 1 year after the Effective Date, the Reorganized Debtor shall pay the Allowed Secured Class 2 Claim in 12 monthly interest only payments, calculated at 3% interest and accruing from the Effective Date.   Thereafter, the Reorganized Debtor shall make principal and interest payments (based on 3% interest), which shall be amortized over a period of 20 years (the "Amortized Payments"), with all outstanding principal and interest due 10 years from the Effective Date.   The payments contemplated under this provision shall be made from the revenues of the Reorganized Debtor' ongoing business operations and/or third party financing that may be obtained by the Debtors following the Effective Date. Payment in full or partial satisfaction of the Allowed Class 2 Claim may be made at any time without penalty.

c)     **Secured Creditor Reserve**.   To the extent that the Class 2 Claim remains a Disputed Claim on the date that any payments become due under the Plan, then the Reorganized Debtor shall make such payments into the Secured Creditor Reserve, to be held in trust for the holders of the Allowed Class 2 Claim until entry of a Final Order determining the amount, priority, and extent of the Class 2 Claim.   For purposes of this Plan, including calculation of principal reductions and the

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

amount of interest accrual, the funds paid into the Secured Creditor Reserve shall be deemed paid on the date deposited therein, even though they may be distributed to holders of Allowed Secured Claims at a later date. The Reorganized Debtor shall not use the funds in the Secured Creditor Reserve after deposited, except as specifically set forth in the Plan or the Confirmation Order, or subsequent Court orders.

2) **ALTERNATIVE - Fully Secured Treatment – 1111(b) Election.**

In the event that Comerica is eligible to and elects to be "fully secured" by asserting an election to be treated under Bankruptcy Code § 1111(b), then Comerica shall receive the alternative treatment set forth in this subsection.[5] Comerica's Allowed Class 2 Claim will receive the same treatment set forth above, except the following modifications shall apply:

a) **No Deficiency Claim**. Comerica shall forgo and waive any unsecured deficiency claim and shall have no Allowed Unsecured Claim in Class 7 or Allowed Subordinated Claim in Class 10.

b) **Extended Term.** Under the § 1111(b) election, the period for Class 2 Amortized Payments shall be over an additional 10-year period, at the end of which time (the 20th Anniversary of Effective Date) the entire unpaid amount of the Class 2 Allowed Secured Claim must be fully satisfied.

c) **Final Payoff.** Under the 1111(b) election, the Allowed Class 2 Secured Claim (on the Effective Date) shall be deemed satisfied in full when the gross amount of distributions made to Comerica under the Plan (whether denominated principal or interest payments) equals the Allowed Class 2 Secured Claim.

d) **Additional Limitations on Class 2 Allowed Claim**. Under any of the foregoing provisions, the Allowed Class 2 Secured Claim shall not include any default interest, prepayment penalties, yield maintenance premiums, late charges, amounts due under any penalty rate provision or penalty provisions of the Comerica Note or the Comerica Security Documents, or attorneys' fees or

---

[5] The Debtor reserves all rights to challenge Comerica's right to elect to have any portion of its Claim treated under § 1111(b) of the Bankruptcy Code.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

costs that accrued or arose after the Filing Date. After the Effective Date, the holder of the Class 2 Allowed Secured Claim may not seek reimbursement or add to the amount of the Class 2 Allowed Secured Claim any appraisal fees, title costs, charges, attorneys' fees or other amounts unless there has been a default by the Reorganized Debtor with respect to the payments required under the Plan. Any and all costs, fees, late fees, or charges arising or relating to events occurring prior to the Effective Date shall be waived and forever released unless included and allowed as part of the Allowed Class 2 Secured Claim. On the Effective Date, the Comerica Note and Comerica Security Documents shall be deemed amended such that the terms of the Plan shall control; no condition that existed prior to the Effective Date, including the filing of this Case, shall serve as a basis for asserting a default under the Comerica Loan and Security Documents. **Under this Comerica Non-Settlement Treatment Option, the Allowed Class 2 Claim is impaired and its holder is entitled to vote to accept or reject the Plan; or**

**II.       Comerica Settlement Plan Treatment.**

The Debtors propose the following treatment of the Comerica Secured Claim in order to resolve and satisfy any and all claims and liens Comerica may have against the Debtors and other persons arising under the Comerica Loan Documents in connection with the Loan. Thus, Comerica's election of the Comerica Settlement Plan Treatment, is conditioned upon (i) entry of Final Orders dismissing the Comerica/Dierich Litigation, the Arizona Guarantor Litigation, and the Texas Guarantor Litigation (ii) the execution of mutual releases among the parties thereto; (iii) Comerica shall be deemed to irrevocably vote in favor of the Plan; and Comerica shall release all liens, claims, and encumbrances that Comerica may have against the Debtors and any other persons arising under the Comerica Loan Documents and connection with the Loan, except as expressly provided in this Section.

A.       **Allowance of Secured Claim.** Comerica shall have an Allowed Class 2 Secured Claim in the amount of 110% of the current liquidation value of the Equipment, as may be agreed to between Comerica and the Debtors or otherwise determined by Final Order of the Court.

B.     **Lien Retention**.  Comerica shall retain its lien interests in the Collateral as security for its Allowed Class 2 Claim.  The Comerica Loan and Security Documents shall be superseded by terms of the Plan and shall be deemed modified to provide that: (i) all non-monetary defaults with respect to Financial Covenants, as that term is defined in the Loan Documents, are forever waived; (ii) in the event of any non-monetary or monetary default by the Reorganized Debtor, Comerica shall provide the Reorganized Debtor written notice of such default and opportunity to cure such default within 30 days of the date of any such written notice; (iii) unless Federal law applies, choice of law shall be the laws of the State of Arizona; and (iv) choice of venue shall be the state or federal courts located in Maricopa County, Arizona.  The Debtor reserves the right to document any amendments to the Loan Documents as may be appropriate to be made consistent with the terms of the Plan in documents that may be provided to Comerica prior to the Confirmation Hearing.

C.     **Payment of Allowed Class 2 Claim.**  Thirty (30) days after the Effective Date, the Reorganized Debtor pay $400,000 to Holder of the Allowed Secured Class 2 Claim, which shall be applied as a principal payment against the Allowed Secured Class 2 Claim.  In addition, beginning thirty (30) days after the Effective Date, the Reorganized Debtor shall pay the Holder of the Allowed Secured Class 2 Claim monthly principal and interest payments (based the Plan Rate of Interest), which shall be amortized over a period of twenty (20) years, with all outstanding principal and interest due seven (7) years from the Effective Date.  The payments contemplated under this provision shall be made from the revenues of the Reorganized Debtor' ongoing business operations and/or third party financing that may be obtained by the Debtors following the Effective Date. Prepayment in full or partial prepayment of the Allowed Secured Class 2 Claim may be made at any time without penalty.

D.     **Waiver of Deficiency Claim.** Other than as expressly provided in this Section, Comerica shall waive and release such other and further liens, claims, and encumbrances that Comerica may have against the Debtors and any other persons arising under the Comerica Loan Documents and connection with the Loan including, but not limited to, any deficiency claim. **Under this Settlement Option, the Allowed Class 2 Claim is impaired and its holder is entitled to vote**

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

**to accept or reject the Plan.**

**Treatment of Class 3 - Secured Property Tax Claims.** The Holders of the Allowed Class 3 Secured Claims shall receive, at the option of the Debtors or the Reorganized Debtor, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claims: (A) the amount of all such unpaid Allowed Claims in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Allowed Claim becomes Allowed and (iii) a date agreed to by the Debtors or the Reorganized Debtor, as the case may be, and the Holder of such Allowed Claim; (B) equal Cash payments on account of all such Allowed Claims from the Reorganized Debtor made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding two (2) years after the assessment of the tax on which such Allowed Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at rate of 5%; or (C) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Allowed Claim and the Debtors or the Reorganized Debtor, as the case may be, or as the Bankruptcy Court may order. The Debtors or the Reorganized Debtor, as the case may be, shall have the right, in their sole discretion, to prepay in full or in part, at any time, any Allowed Secured Class 3 Claim without premium or penalty. **The Allowed Secured Class 3 Claims are impaired and are entitled to vote to accept or reject the Plan.**

**Treatment of Class 4 – Priority Employee Claims**

The Holders of the Allowed Class 4 Priority Employee Claims shall receive, at the option of the Debtors or the Reorganized Debtor, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claims: (A) the amount of all such unpaid Allowed Claims in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Allowed Claim becomes Allowed and (iii) a date agreed to by the Debtors or the Reorganized Debtor, as the case may be, and the Holder of such Allowed Claims; (B) equal Cash payments to the Holders of all such Allowed Claims from the Reorganized Debtor made on the last Business Day of every one (1) month period following the Effective Date, over a period not

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

exceeding three (3) years after the Effective Date, totaling the principal amount of such Allowed Claims plus simple interest on any outstanding balance from the Effective Date calculated at rate of 4%; or (C) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of any such Allowed Claim and the Debtors or the Reorganized Debtor, as the case may be, or as the Bankruptcy Court may order.  The Debtors or the Reorganized Debtor, as the case may be, shall have the right, in their sole discretion, to prepay in full or in part, at any time, any Allowed  Class 4 Claim without premium or penalty.  **The Allowed Class 4 Claims are impaired and are entitled to vote to accept or reject the Plan.**

**Treatment of Class 5 - Priority Tax Claims.**  The Holders of the Allowed Class 5 Priority Tax Claims shall receive, at the option of the Debtors or the Reorganized Debtor, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (A) the amount of all such unpaid Allowed Claims in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Allowed Claim becomes Allowed and (iii) a date agreed to by the Debtors or the Reorganized Debtor, as the case may be, and the Holder of such Allowed Claim; (B) equal Cash payments on account of all such Allowed Claims from the Reorganized Debtor made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Allowed Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at rate of 5%; or (C) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of any such Allowed Claim and the Debtors or the Reorganized Debtor, as the case may be, or as the Bankruptcy Court may order.  The Debtors or the Reorganized Debtor, as the case may be, shall have the right, in their sole discretion, to prepay in full or in part, at any time, any Allowed Priority Tax Claim without premium or penalty.  **The Allowed Class 5 Claims are impaired and are entitled to vote to accept or reject the Plan.**

**Treatment of Class 6- Consignment Claims.** The Consignment Creditors shall retain all of their legal rights with respect to the Debtors and the Consignment Equipment, which shall remain governed by terms of the Consignment Agreements, except as expressly amended herein. The Reorganized Debtor shall be bound to the terms of the Consignment Agreements, which shall be deemed executory contracts within the meaning of Bankruptcy Code § 365 and assumed by the terms of the Confirmation Order, as amended herein. From and after the Effective Date, the Consignment Agreements shall be deemed to be amended as follows:

1. The Consignment Creditors shall be granted a first priority security interest in 80% of the revenues collected by the Reorganized Debtor through its use and/or lease of the Consignment Equipment from and after the Effective Date.

2. 80% of the revenues collected by the Reorganized Debtor through its use and/or lease of the Consignment Equipment from and after the Effective Date will be segregated by the Reorganized Debtor into a separate account established by the Reorganized Debtor and designated solely for the purpose of collecting and remitting such revenues to the Consignment Creditors.

Notwithstanding any other provision of the Consignment Agreements, each holder of an Allowed Class 6 Claim shall receive, at the option of the Debtors or the Reorganized Debtor, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of monetary arrearage due in connection with the Consignment Agreements: (A) the amount of any monetary arrearage in cash on or as soon as reasonably practicable after the later of (i) the Effective Date (ii) the date upon which such arrearage becomes due and owing by the Debtors under the terms of the Consignment Agreements or (iii) a date agreed to by the Debtors or the Reorganized Debtor, as the case may be, and the Consignment Creditor or (B) such other treatment on such other terms and conditions as may be agreed upon in writing by the Consignment Creditor and the Debtors or the Reorganized Debtor, as the case may be, or as the Bankruptcy Court may order. The Debtors or the Reorganized Debtor, as the case may be, shall have the right, in their sole discretion, to prepay at any time any arrearage or payment due under the Plan without premium or penalty. **The Allowed Class 6**

**Claims are impaired and are entitled to vote to accept or reject the Plan.**

**Treatment of Class   7 – Comerica Deficiency Claim.**

**Disputed Claim.**   Until a Final Order is entered by the Court Allowing the Class 7 Claim and determining the amount thereof, and whether any portion thereof is to be treated under Class 2 or Class 10 of this Plan, the Class 7 Claim shall be deemed a Disputed Claim.

**Payment**.   Comerica shall receive, on account of its Allowed Class 7 Claim, a share of the Unsecured Claims Fund to be distributed on a prorated basis with the holders of Allowed Class 8 Claims.  Until the Class 7 and 8 Claims are paid in full, there shall be no payments to any Class of Creditors or Interests Holders junior to Classes 7 and 8 on account of their Claims in this Case.

**Contingency Regarding Priority and Other Unsecured Classes**.   The foregoing provisions regarding treatment of the Class 7 Claim, priority of payment, pro-rata payment with Class 8, and the nature and timing of payment are all subject to provisions of any Final Order arising out of the Comerica/Dierich Litigation, any objections the Debtors may bring to Unsecured Claims, and any other proceedings discussed in the Disclosure Statement.  **The Class 7 Claim is impaired and its Holder is entitled to vote to accept or reject the Plan.**

**Treatment of Class 8 – General Unsecured Claims.**

The Holders of Allowed Class 8 Claims shall receive, on account of their Allowed Class 8 Claims, a share of the Unsecured Claims Fund to be distributed on a prorated basis with the Holders of Allowed Class 7 and Class 8 Claims.  Until the Allowed Class 7 and 8 Claims are paid in full, there shall be no payments to any Class of Creditors or Interests Holders junior to Classes 7 and 8 on account of their Claims or Interests in this Case.  In addition, the inclusion of Class 7 in the pro-rata distribution requirements and other provisions of this paragraph are subject to change pending entry of a Final Order of the Court with regard to the Comerica/Dierich Litigation, any objections the Debtors may bring to Unsecured Claims, and any other proceedings discussed in the Disclosure Statement.

**Class 8 Claims are impaired and the Holders thereof are entitled to vote to accept or reject the Plan.**

**Treatment of Class 9 – Existing Equity Interests.**

The Holders of the existing membership interests in the Debtors shall retain commensurate with their Existing Equity New Value Contributions, interests in the Reorganized Debtor, but shall take nothing thereon until all payments required under the Plan have been made to the holders of Allowed Claims in Classes 1 – 8, unless such restriction is modified by the Court in any Final Order arising out of the Comerica/Dierich Litigation or any other proceedings discussed in the Disclosure Statement, or any other Final Order modifying the priorities of Classes of Creditors as to Class 9. **Class 9 Interests are held by the Cowings, who are insiders of the Debtors, and they are not entitled to vote to accept or reject the Plan.**

**Treatment of Class 10 – Claims Subordinated by Court (Equitable Subordination)**

Class 10 is reserved for Allowed Claims or any portion thereof that are the subject of an Order entered by the Court that has become a Final Order that determines that the priority of such Allowed Claim shall be subordinated to any or all of the preceding Classes of Claims and Interests. The Class 10 Claims or any subclasses created hereunder shall be treated in accordance with any Final Order directing such treatment and the Confirmation Order.

**Voting by Classes / "Cram-Down" Request.**

1.      The holders of Allowed Claims or Interests in the following Classes hold Claims or Interests that are impaired under the Plan and therefore are entitled to vote on the acceptance or rejection of the Plan:  **CLASSES 2, 3, 4, 5, 6, 7 and 8.**

2.      The Debtors have requested in the Plan that confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) be approved with respect to any Class of Claims or Interests that is impaired and does not vote to accept the Plan, and with respect to any Class of Claims or Interests that is deemed to have rejected the Plan.

## XIV.    EXECUTORY CONTRACTS AND LEASES.

A.      **General Information**.  Certain unexpired contracts and leases and claims thereunder are treated pursuant to Bankruptcy Code Section 365 and separate provisions in the Plan.  In general, an executory contract is a contract on which material performance remains due from both contracting

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

parties.  Under the Plan, all unexpired leases and executory contracts shall be **deemed rejected** by the Debtors as of the Effective Date, except unexpired leases or executory contracts previously assumed or rejected during the Case, or identified by the Debtors in writing as being assumed by the Debtors prior to or in the Confirmation Order.  Upon entry of the Confirmation Order, all defaults under such assumed executory contracts shall be deemed cured or to be cured within a reasonable time, and the Debtors shall be deemed to have provided adequate assurance of future performance under the terms of this Plan.

## XV.  LITIGATION.

### A.  Summary of Litigation.

Under the Plan, the Reorganized Debtor shall be empowered to prosecute any cause of action, claim, lawsuit, contested matter and adversary proceeding that could have been brought by the Debtors as debtors in possession.  The litigation anticipated by the Debtors has been identified throughout this Disclosure Statement, and is listed as follows:

- The Comerica/Dierich Litigation
- The Collection Litigation

### B.  Potential Avoidance Claims.

It is not contemplated that Debtors will pursue any actions for avoidable transfers under 11 U.S.C. § 544 *et seq*.  The statute of limitations applicable to any such actions that are identified as against any insider or affiliate of the Debtors will be deemed tolled for the term of the Plan.  To the extent that the Debtors recover any net proceeds from transfers actually avoided by the Debtors after the Confirmation Date such recoveries shall be treated as additional income under the Plan when calculating Net Profits hereunder.

### C.  Other Claims and Reservation Of Rights And Notice.

The Debtors reserve all rights hereunder to commence, continue, amend and prosecute all actions, causes of action, objections to claims, setoffs, recoupment rights, defenses and counterclaims or any other matters after confirmation of the Plan and through the Reorganized Debtor after the Effective Date, as against all:

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

(1)     persons that have filed or do file proofs of claim in this case;

(2)     all persons involved in the litigation described herein, including but not limited to:  (i) Comerica; (ii) Dierich; (iii) the Employee Defendants; (iv) GE; (v) Moors & Cabot; and (vi) each of the account debtors (*see* **Exhibit A** hereto);

(3)     all parties to the actions listed in Question 4 to RMMC's Statement of Financial Affairs filed in this case, a copy of which is attached hereto as **Exhibit G**; and

(4)     any parties to post-petition transactions with the Debtors.

The Debtors reserve the right to amend or supplement this paragraph at any time prior to the Effective Date of the Plan.

## XVI.    IMPLEMENTATION OF THE PLAN

1.     **Substantive Consolidation.**     The Plan contemplates and is predicated upon substantive consolidation of each of the Debtors Estates into the Estate of RMMC prior to the Confirmation Date for the purpose of all actions associated with confirmation and consummation of the Plan.  Substantive consolidation is an equitable remedy which a bankruptcy court is asked from time to time to apply in cases involving affiliated debtors. As contrasted with administrative consolidation,[6] substantive consolidation affects the substantive rights and obligations of creditors and debtors.  Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors; all of the debtors in the substantively consolidated group are treated as if they were a single corporate/economic entity. The consolidated assets create a single fund from which all claims against the consolidated debtors are to be satisfied. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored.

---

[6]     Administrative consolidation is the administrative process, pursuant to Bankruptcy Rule 1015(b), whereby the proceedings of two or more affiliated debtors are conducted as part of a single proceeding for the convenience of the bankruptcy court and parties in interest.  Administrative consolidation does not affect the substantive rights of the debtors or their respective creditors and interest holders.  The Reorganization Cases were procedurally consolidated by order of the Court dated August 13, 2009.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Section 105 of the Bankruptcy Code provides the basis for the power to substantively consolidate interrelated chapter 11 cases. Within this framework of a court exercising its equitable powers, the factors to which courts have looked to determine the appropriateness of substantive consolidation include, among others: (i) whether creditors dealt with the debtor entities as a single economic unit and did not rely on their separate identities in extending credit (ii) the presence or absence of consolidated financial statements; (iii) the existence of inter-company guarantees or loans; (iv) the unity of interest and ownership between the various corporate entities; and (v) the commingling of assets and business functions. Courts have ordered substantive consolidation where the proponents have demonstrated (i) either a harm to be avoided or (ii) a benefit to be effected generally which, under the circumstances and considering whether the rights of third parties would be unduly prejudiced thereby, it is equitable to effect.

The Debtors believe that substantive consolidation is appropriate under these circumstances because RMMC has historically comprised all of the Debtors business operations, with BTH, Pacific and Holdings having been formed primarily to obtain favorable tax treatment that is longer available. Comerica holds first priority secured claims against each of the Debtors Estates, fully encumbering all of their respective assets. BTH, Pacific and Holdings have limited creditors beyond Comerica and intercompany and insider claims, which are all wholly unsecured. The Debtors' creditors, including Comerica, have historically treated them as a single economic unit, relying on consolidated financial information and not their structurally separate corporate entities in determining their creditworthiness and extending credit. The Debtors further believe that substantive consolidation of the Estates will facilitate the implementation of the Plan, enabling the Debtors to treat holders of Claims with greater similarity and fairness and save administrative costs by simplifying administration of the remaining assets and liability of the remaining assets and liabilities. The Debtors believe that, in addition to being justified pursuant to applicable law, substantive consolidation is in the best interests of their creditors. The Debtors believe that the recovery of virtually all creditors will be higher under the Plan than it would be if there were no substantive consolidation.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Unless substantive consolidation has been approved by a prior order of the Bankruptcy Court, the Plan shall serve as a motion by the Debtors seeking entry of an order of the Bankruptcy Court substantively consolidating the estates of each of the Debtors into RMMC's estate. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the substantive consolidation of each of the Debtors and their respective estates into RMMC's estate. On the Confirmation Date, and effective as of the Effective Date, the Estates of the Debtors will be substantively consolidated into RMMC's Estate, including, without limitation, for purposes of confirmation, voting, distributions and Claim allowance. The substantive consolidation of the Estates of the Debtors will have the following effects:

a.      all assets and liabilities of the Estates of the Debtors shall be treated as though they were assets and liabilities of the RMMC estate;

b.      no distributions shall be made under the Plan on account of any intercompany claims among the Debtors (whether arising pre-Filing Date or post-Filing Date);

c.      for all purposes relating to confirmation, the Debtors' Estates shall be deemed to be one consolidated estate for RMMC, including, without limitation, for purposes of tallying acceptances and rejections of the Plan, distributions, and Claim allowance;

d.      all pre-Filing Date cross-corporate guarantees of the Debtors shall be eliminated;

e.      all Claims based upon guarantees of collection, payment, or performance made by one or more of the Debtors as to the obligations of another of the Debtors or of any other Person shall be discharged, released, and of no further force and effect;

f.      any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of the consolidated Estate;

g.      any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the consolidated Estate;

h.    each and every Claim filed or to be filed in the Reorganization Cases against any of the Debtors shall be deemed filed against the consolidated estate, and shall be deemed to be one Claim against and obligation of the consolidated Estate; and

i.    the Reorganization Cases of all of the Debtors other than RMMC (Case No. 09-19166) shall be deemed to have had a final decree entered therein and shall be closed; provided, however, that nothing contained in this Plan shall affect the obligation of RMMC (or the Reorganized Debtor after the Effective Date) to pay quarterly fees in Case No. 09-19166 to the United States Trustee pursuant to 28 U.S.C. § 1930(f) until its chapter 11 case is closed, dismissed or a final decree has been entered therein.

Such substantive consolidation shall not (other than for purposes related to the Plan, and the distributions to be made hereunder) affect the corporate structures of the Debtors and shall not be deemed to have an effect adverse to the recovery of the Reorganized Debtor in any litigation involving the Debtors.  For all purposes, the Reorganized Debtor will be considered the surviving entity and the attributes and characteristics of RMMC will remain unaffected by the substantive consolidation of the Estates of the Debtors into the RMMC Estate.

2.    **New Equity/New Value Contributions.**    On the Effective Date, the New Equity Holders and Linda and/or Owen Cowing shall contribute a minimum of $1.5 million in cash to the Reorganized Debtor in exchange for 100% of the equity of the Reorganized Debtor, which shall be distributed among such contributors on a pro-rata basis based on such contributors New Equity Contribution or Existing Equity New Value Contribution, as may be applicable.  For over one year prior to the Filing Date, and in the time that has passed since the Filing Date, the Debtors have actively pursued and solicited third-party financing and/or third party investors in connection with the refinancing and/or sale of the Debtors' operations as a going concern.  Such efforts included, but were not limited to, the Debtors' retention of Moors & Cabot to evaluate and market the Debtors' business operations.  Notwithstanding such efforts, the Debtors were unable to obtain an offer for purchase or a commitment to finance its ongoing operations on better terms than those proposed by the Plan.

Accordingly, the Debtors submit that the new equity and new value contributions are meaningful and not deminimus.

3.     **Business Operations/Management**.   The Plan contemplates that the Reorganized Debtor will be a newly formed limited liability corporation whose members will consist of the New Equity Holders.   The Reorganized Debtor shall be governed by its Articles of Organization and Operating Agreement, copies of which will be filed with the Bankruptcy Court fourteen (14) days prior to the Confirmation Hearing, including a disclosure of the New Equity Holders.   After the Confirmation Date, as well as after the Effective Date, the Reorganized Debtor shall be empowered to do all business without court approval including but not limited to the items discussed below, unless such act is specifically limited by this Plan.   If any changes to the Debtors' corporate documents are required under the terms of this Plan or the Confirmation Order, then such amendments shall be made prior to the Effective Date.

As described above, as of the Filing Date, the Debtors' industry had reached bottom and had begun to recover.   Since that time, the Debtors have achieved significant increases in sales and revenues.   Specifically, the Debtors have increased their machines on rent from a low of approximately 12 machines in July 2009 to their current levels of approximately 30 machines.   The increased rentals have resulted in improved rental revenues and positive cash flow of more than $40,000, since the Filing Date.   At the same time, the Debtors have managed to significantly reduce their ongoing expenses through the closure of their California and Nevada locations and through the aforementioned sale of approximately one-half of their fleet in October 2009.   Based on these historical results, the improving marketplace, and the anticipated infrastructure investments to be made in the coming years through private and public funds, the Debtors are well positioned for continued growth and recovery.

The Debtors' current cost structure and anticipated post-reorganization debt servicing obligations will require the Debtors to maintain approximately 35 machines on rent going forward. The Debtors budget projections for the seven-year plan period is attached hereto as **Exhibit H**.   As reflected in the budget, the Debtors reasonably believe that by mid-2010, they will achieve and

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

maintain a rental rate of approximately 50% of their equipment and realize consistent and sustained operating profits by the close of 2010. During the first seven years of the plan, the Debtors project to generate EBITDA of $18,188,476 and Net Profits of $12,357,348 from which they will fund the Plan payments contemplated hereunder. In addition, the New Equity Contribution will sufficiently capitalize the Debtors and provide funding for any budget shortfalls that may occur during the first year after the Effective Date. Moreover, the Debtors anticipate that the marketplace for the Equipment, which has also reached bottom, will experience modest growth in value and provide the Reorganized Debtor with additional sources of collateral from which it may raise capital and fund the Plan payments.

The Debtors' recent successes are a direct result of the efforts of their founder, Owen Cowing, will remain a vital part of the Reorganized Debtor. Specifically, the Reorganized Debtor will continue to be managed by Owen Cowing, whose industry knowledge, experience and expertise is vital to the Reorganized Debtor's future success following the Effective Date. Owen Cowing's dedication and commitment to the Reorganized Debtor will be reinforced through his equity interest in the Reorganized Debtor, which is to be achieved by his Existing Equity New Value Contribution under the Plan.

**4. Prosecute Comerica/Dierich Litigation, Other Litigation.** The Reorganized Debtor shall have the power to bring, dismiss or compromise any Causes of Action, including but not limited to the Comerica/Dierich Litigation, the Collection Litigation, and Debtors' Claims for Equitable Subordination, and other proceedings discussed herein, and all matters pertaining to the implementation of the Plan.

**5. Retention and Payment of Professionals.** Until the Effective Date, all applicable Bankruptcy Code Sections and Rules pertaining to the employment and compensation of Professionals shall be applicable to the Case. However, from and after the Effective Date, the Reorganized Debtor is empowered to retain and compensate professional persons in the ordinary course of business for all services provided after the Effective Date.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

6. **Act as Disbursing Agent.** Unless otherwise set forth in the Confirmation Order, the Reorganized Debtor shall act as Disbursing Agent under the Plan. The Disbursing Agent shall ensure that Initial Distributions provided for under this Plan are accurately and timely made. The Disbursing Agent shall create and maintain a register of all Allowed Claims and a record of all payments made on account of such Allowed Claims. The Disbursing Agent shall calculate (with the assistance of any professionals deemed necessary) the pro-rata distributions and make other calculations necessary to implement the provisions of this Plan regarding distributions to Creditors. The Disbursing Agent shall administer the Secured Creditor Reserve in accordance with the terms of the Plan.

7. **Extraordinary Transactions Regarding the Collateral.** If at any time after the Effective Date, the Reorganized Debtor obtains opportunities for new financing, new equity funds, or a sale of the Collateral that is sufficient satisfy the Allowed Claims and Interests hereunder that have not been previously satisfied, and such opportunity is in the Reorganized Debtor's business judgment a beneficial transaction for the Reorganized Debtor and Creditors and Interest Holders, the Reorganized Debtor may proceed with such transaction after completing the following conditions: (1) the Reorganized Debtor shall provide prior written notice of the proposed transaction to any unpaid creditors holding Allowed Claims or Disputed Claims under the Plan at least 15 days prior to entering into such transaction (though the Reorganized Debtor may enter into such transaction if it is expressly subject to the provisions of the Plan and this Paragraph, (2) any person, including the Reorganized Debtor, may request a court hearing to object to or to facilitate consummation of the proposed transaction within the 15-day period (or prior thereto for the Reorganized Debtor). The standard in such hearing shall be whether the proposed transaction satisfies the criteria in this paragraph and is generally in the best interests of the Reorganized Debtor, its Creditors and its Equity Holders.

8. **Vesting of Property.** Pursuant to 11 U.S.C. §§ 541(a) and 1141(b), all property of the Debtors will vest in the Reorganized Debtor at Confirmation, free and clear of all liens, Claims, encumbrances and interests, except as expressly provided in the Plan in regard to Allowed Secured Claims.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

9.    **Post Confirmation Management and Compensation**.  The Reorganized Debtor shall be managed after the Effective Date by its Manager Owen Cowing, according to the terms of any operating agreement entered into between and among the members of the Reorganized Debtor.  The Reorganized Debtor shall compensate Owen Cowing for his management services a his current rate of $198,000 per year.  As described above, Owen Cowing's continued participation in and management of the Reorganized Debtor is vital to its continued and future success.

10.    **Reports After the Effective Date.**  The Reorganized Debtor, beginning six-months after the Effective Date, and thereafter at least once per year, shall provide parties on the Post-Confirmation Notice List a financial report summarizing the construction, sales and rental activities of the Reorganized Debtor, receipts and disbursements made by the Reorganized Debtor, and an estimate of the time at which commencement of payments to each Class under the Plan may be made.

11.    **Post-Confirmation Notice.**  Any Creditor desiring to be notified of any court proceedings or other notices under the Plan to be made after the Effective Date must file a Request for Notice with the Debtors and the Clerk of the Bankruptcy Court within 30 days of receiving a written notice of the entry of the Confirmation Order.  The Confirmation Order will set forth this requirement, and shall be served on all creditors and interested parties.

## XVII.    CHAPTER 7 LIQUIDATION COMPARISON

The Debtors believe that because of the reputation of the RMMC brand in the marketplace, the depth of the experience of their management team, and their positioning to capitalize on the expected recovery of the construction trades through federal stimulus dollars, their business is worth more as a going concern than through liquidation.  Indeed, RMMC is uniquely positioned within the construction industry to capitalize on the expected industry-wide recovery.  Specifically, competition within the equipment rental industry has waned significantly during the recent economic slowdown because of the closure and liquidation of many competitors.  Future competition is likely to remain limited due to the high startup costs facing any new market entrant.  In addition, as the recovery gains momentum, supplies of the machines and equipment in which Debtor specializes will be limited generally as a result of a manufacturing slowdown of similar equipment during the economic

downturn.

Specifically, the Debtors believe that a reasonable estimate of the result of a chapter 7 liquidation in these Reorganization Cases is presented in the following charts:

## RMMC Liquidation Analysis

| Combined RMMC Debtors | Liquidation Discount Rate | | Assumptions |
|---|---|---|---|
| Equipment (attached) | 0% | $7,500,000 | 1 |
| Accounts Receivable | 35% | 300,000 | 2 |
| FF&E | 85% | 20,000 | 3 |
| Intellectual Property | 90% | 50,000 | 4 |
| Supplies | 50% | 150,000 | 5 |
| Total Liquidation Proceeds | | $8,020,000 | |

Less:

| | | | |
|---|---|---|---|
| Tax Claims (pre and post - estimate) | $ | 175,000 | 6 |
| Admin Claims in Total (estimate) | $ | 150,000 | 7 |
| Wind down asset liquidation costs (estimate) | $ | 500,000 | 8 |
| | $ | 825,000 | |

| | | |
|---|---|---|
| NET ASSET LIQUIDATION VALUE | $ | 7,195,000 |
| **Distribution to Secured Creditor Comerica** | **$** | **7,195,000** |
| **Distribution to Consignment Creditors** | | **zero** |
| **Distribution to Unsecured Creditors** | | **zero** |

| | | |
|---|---|---|
| 1 | *Debtor estimate of asset value* | |
| 2 | *Gross AR collected at rate of 65% on the dollar* | |
| 3 | *FF&E is composed of older office furniture and older technology equipment with nominal resale value* | |
| 4 | *Customer book and history severely diminished in value with the absence of management and relationships* | |
| 5 | *Parts, small equipment liquidated at 50% cents of cost* | |
| 6 | *Pre and post petition real, sales and property taxes* | |
| 7 | *Estimate of misc claims made as admin claims to BK case, i.e. payroll, rents, cure costs etc.* | |
| 8 | *Estimated cost of insurance , rent and personnel to conduct liquidation. Equipment liquidation costs are already netted.* | |

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

# RMMC Liquidation Analysis

| Individual Debtors | Liquidation Discount Rate | RMMC | BTH | RMP | Assumptions |
|---|---|---|---|---|---|
| Equipment (attached) | 0% | $1,875,000 | $975,000 | $4,650,000 | 1 |
| Accounts Receivable | 35% | $300,000 | | | 2 |
| FF&E | 85% | $20,000 | | | 3 |
| Intellectual Property | 90% | $50,000 | | | 4 |
| Supplies | 50% | $150,000 | | | 5 |
| Total Liquidation Proceeds | | $2,395,000 | $975,000 | $4,650,000 | |
| | | | | | |
| Less: | | | | | |
| | | | | | |
| Tax Claims (pre and post - estimate) | | $43,750 | $22,750 | $108,500 | 6 |
| Admin Claims in Total (estimate) | | $37,500 | $19,500 | $93,000 | 7 |
| Wind down asset liquidation costs (estimate) | | $125,000 | $65,000 | $310,000 | 8 |
| | | $206,250 | $107,250 | $511,500 | |
| | | | | | |
| NET ASSET LIQUIDATION VALUE | | **$2,188,750** | **$867,750** | **$4,138,500** | |
| | | | | | |
| **Distribution to Secured Creditor Comerica** | | **$2,188,750** | **$867,750** | **$4,138,500** | |
| **Distribution to Consignment Creditors** | | **zero** | **zero** | **zero** | |
| **Distribution to Unsecured Creditors** | | **zero** | **zero** | **zero** | |

1. *Debtor estimate of asset value*
2. *Gross AR collected at rate of 65% on the dollar*
3. *FF&E is composed of older office furniture and older technology equipment with nominal resale value*
4. *Customer book and history severely diminished in value with the absence of management and relationships*
5. *Parts, small equipment liquidated at 50% cents of cost*
6. *Pre and post petition real, sales and property taxes*
7. *Estimate of misc claims made as admin claims to BK case, i.e. payroll, rents, cure costs etc.*
8. *Estimated cost of insurance , rent and personnel to conduct liquidation. Equipment liquidation costs are already netted.*

Clearly, the Debtors' successful reorganization under the Plan are the key to Debtors' ability to pay the holders of Allowed Claims and Interests. The cash generated from future sales and rentals, projected to be at $12 million over 7 years is far superior to the liquidation of the assets in today's

{02471.002/00130669.DOC /}

market.

## XVIII.  TAX CONSEQUENCES OF THE PLAN

The Debtors are each organized as "pass-through" entities for purposes of taxation.  As a result, the Debtors believe that any tax consequences the Plan may have will be limited and inconsequential.

The holders of Allowed Claims and Interests in Debtors should consult with their respective tax advisors regarding potential tax consequences of any deductions available with regard to losses on account of their Claims or Interests, and /or consequences of the receipt of distributions under the Plan on account of their claims or interests.

In summary, the PLAN MAY HAVE TAX CONSEQUENCES TO THE CREDITORS AND INTEREST HOLDERS OF THE DEBTORS' ESTATES.  THE DEBTORS URGE ALL PARTIES TO CONSULT THEIR OWN TAX ADVISORS.

## XIX.  CONCLUSION

THE DEBTORS HAVE PROPOSED THE PLAN IN A GOOD FAITH EFFORT TO MAXIMIZE THE RECOVERY FOR ALL CREDITORS, TO STABLIZE AND CONTINUE ITS OPERATIONS AS A GOING CONCERN AND TO USE INCOME FROM SALES AND RENTALS OF EQUIPMENT TO PAY CREDITORS AND EQUITY HOLDERS THE BEST RETURN POSSIBLE ON THEIR ALLOWED CLAIMS AND INTERESTS.  THE DEBTORS URGE CREDITORS AND INTERESTED PARTIES TO VOTE TO ACCEPT THE PLAN.

DATED this 9th day of December, 2009.

**RED MOUNTAIN MACHINERY**
**RED MOUNTAIN HOLDINGS, LLC**
**RED MOUNTAIN PACIFIC LLC**
**BTH, LLC**

By _____*/s Dave Gonzales*_____
Its:_____Chief Restructuring Officer_____

Prepared/Submitted by:

**ENGELMAN BERGER, P.C.**


By_____*/s SBA #009613*_____
      Steven N. Berger
      Scott B. Cohen
      Patrick A. Clisham
      3636 North Central Avenue, Suite 700
      Phoenix, Arizona 85012
      **Attorneys for Red Mountain Machinery Company, Red Mountain Holdings, LLC, Red Mountain Pacific LLC and BTH, LLC**

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012